UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:21CR98(JBA) |
| | : | |
| v. | : | |
| | : | |
| KENSTON HARRY | : | Date:   December 14, 2022 |

## GOVERNMENT'S OPPOSITION TO DEFENDANT KENSTON HARRY'S RULE 29 MOTION

The Government submits this memorandum in opposition to Defendant Kenston Harry's ("Harry") November 29, 2022, motion for a judgment of acquittal (Doc. No. 605).

In his memorandum ("Def. Mem.") in support of his motion brought under Federal Rule of Criminal Procedure 29, Harry seeks judgements of acquittal on his conviction on Count One of the Superseding Indictment (conspiracy to distribute and possess with intent to distribute controlled substances), specifically the jury's unanimous findings that Harry knowingly and intentionally conspired to distribute fentanyl and cocaine, and that the quantities of fentanyl and cocaine were reasonably foreseeable to Harry. In the alternative, Harry seeks judgments of acquittal as to the jury's unanimous findings of the quantity of fentanyl and cocaine that was reasonably foreseeable to Harry as part of the conspiracy, 400 grams or more, and 500 grams or more, respectively.  With respect to Count Two (possession with intent to distribute 400 grams or more of fentanyl) and Count Three (possession with intent to distribute 500 grams or more of cocaine) of the Superseding Indictment, Harry similarly seeks judgements of acquittal, or, in the alternative, seeks convictions only for lesser-included offenses for possession of unspecified

quantities of fentanyl and cocaine. Harry does not challenge his conviction on Count Five (possession with intent to distribute marijuana), nor does he challenge his conviction on Count One for conspiring to distribute and possess with intent to distribute marijuana.

Harry again raises an argument previously rejected by this Court, that collateral estoppel barred his prosecution on the fentanyl quantity allegation in Count One of the Superseding Indictment – that Harry knew and reasonably should have foreseen from his own conduct and that of other members of the conspiracy, that the conspiracy involved 400 grams or more of fentanyl. Harry claims his conviction cannot stand because in a separate trial with separate evidence, a separate jury did not unanimously agree that it was reasonably foreseeable to co-defendant Tajh Wiley ("Wiley") that the conspiracy involved 400 grams or more of fentanyl. This issue was briefed by the parties. *See* Doc. Nos. 513, 515. This Court rejected the theory that collateral estoppel required dismissal of the fentanyl quantity charge in Count One of the Superseding Indictment. *See* Doc. No. 525.

Harry's remaining arguments amount to a challenge of the sufficiency of the evidence, that there was insufficient evidence to support his convictions on Counts One, Two and Three.

Harry misconstrues the evidence presented at trial and ignores significant components of the Government's case-in-chief.  Contrary to his suggestions, the jury reached its verdict based on a fair and rational analysis of sufficiently inculpatory evidence.  Sufficient evidence, including, intercepted wire communications, physical and electronic surveillance, and Harry's electronic communications with Wiley and others, sustained his conviction. For these reasons, Harry's motion should be denied in its entirety.

I.      **BACKGROUND**

A.  **Procedural Summary**

On October 20, 2021, Wiley was charged in Counts One, Two, Three, and Five of the Superseding Indictment.  Count One charged him with conspiracy to distribute and to possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, 500 grams or more of a mixture of substance containing a detectable amount of cocaine, and an unspecified quantity of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 841(b)(1)(D).  *See* Doc. No. 179-1.  Count Two charged him with possession with the intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Count Three charged him with possession with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Count Five charged him with possession with the intent to distribute an unspecified quantity of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).

The charges stemmed from Harry's close involvement with Wiley, a drug trafficker based in the Bridgeport area who was the subject of a Drug Enforcement Administration ("DEA") wiretap investigation. Harry and Wiley were close confederates and frequently together on dates where Wiley communicated in furtherance of drug distribution. Harry's residence, 327 Park Avenue in Bloomfield, Connecticut ("327 Park Avenue"), was used by Harry and Wiley as a central hub from where controlled substances were prepared, packaged and distributed. To be sure, Harry also ran a business, called the Action Audio Store, located at 2814 Main Street in Hartford, Connecticut. Harry split time between running the Action Audio Store and participating in the

drug trade with Wiley, and others. But Harry and Wiley also conducted drug-related business from Action Audio, communicating in furtherance of drug distribution, meeting with each other and other co-conspirators at that location, and through use of vehicles (*e.g.*, a Honda Accord) controlled by Harry to transport items between 327 Park Avenue and the Action Audio Store.

Wiley was the initial focus of the investigation, led by members of the DEA in Bridgeport, Connecticut. In April 2021, and again in May 2021, DEA received authorization to intercept ("wiretap") communications occurring to and from a cellular telephone used by Wiley (the "Target Telephone"). Interception occurred between April 16, 2021 and June 9, 2021 (with a short gap between May 14-18, 2021 where communications were not intercepted). In each of the wiretap applications and subsequent wiretap orders, Harry was a named target. Communications intercepted over the Target Telephone revealed some drug-related communications between Harry and Wiley. But, as learned after cellular telephones were seized from Harry and Wiley upon their respective arrests, the pair typically communicated using encrypted Apple iMessage communications, including recorded voice memos, communications that could not be intercepted through use of the wiretap. Further, as revealed through DEA physical surveillance, Harry and Wiley were frequently together in April and May of 2021, communicating with each other in-person, including on dates where the pair packaged controlled substances for distribution at 327 Park Avenue.

On June 9, 2021, federal search warrants authorized the search of Harry's residence, 327 Park Avenue, along with the Action Audio Store. Harry had stayed the night at a Greenwich Hotel and was arrested the morning of June 9, 2021 after he travelled from Greenwich to Hartford, to

the office of his attorney. A search of Action Audio revealed a scale and a quantity of marijuana. A search of 327 Park Avenue revealed a quantity of marijuana in the basement. In the kitchen, there were tools used to package cocaine, along with cut material. In the first-floor bedroom controlled and used by Harry, there was over a kilogram of fentanyl, a kilogram of cocaine, marijuana, identification and personal effects belonging to Harry, and a nine-millimeter pistol magazine that matched the brand and type of a pistol that was carried by Harry when he was arrested.

After Harry's June 9, 2021 arrest, he was released pending trial. By May 4, 2022, a majority of the co-defendants had resolved their cases. Only Wiley, Harry, and Watson remained scheduled for trial.  Doc. No. 355.  Days before scheduled jury selection, Harry moved to sever his case from Wiley (and, effectively, Watson) on the theory that Wiley and Harry had irreconcilable defenses. Doc. No. 411.  The Court, after a sealed hearing on July 8, 2022, in which the Government did not participate, granted Harry's motion.  Doc. No. 420.

Between July 11, 2022 and July 25, 2022, Wiley and Watson were jointly tried on their respective charges contained in the Superseding Indictment.  On July 25, 2022, the jury found Wiley guilty for Count One, conspiracy to distribute and possess with intent to distribute fentanyl, cocaine and marijuana. *See* Doc. No. 457. The jury unanimously found that it was reasonably foreseeable to Wiley that the conspiracy charged in Count One involved an unspecified quantity of fentanyl, 500 grams or more of cocaine, and an unspecified quantity marijuana. *Id*. The jury did not unanimously find Wiley responsible for a quantity of fentanyl measuring 400 grams or more. *Id.*  The jury also found Wiley guilty for Count Four, possession with the intent to distribute crack

cocaine.  *Id*.  The jury further found Watson guilty as to Count One, conspiracy to distribute and possess with intent to distribute marijuana. Doc. No. 458.  The jury did not unanimously find that it was reasonably foreseeable to Watson that the conspiracy involved cocaine.  *Id*.

Between October 4, 2022 and October 5, 2022, a jury was selected for Harry's trial. Evidence began on October 6, 2022 and the Harry trial concluded on October 17, 2022. On October 18, 2022, the jury returned a verdict of "guilty" on all counts. On Count One, conspiracy to distribute and possess with intent to distribute fentanyl, cocaine and marijuana, the jury unanimously found that it was reasonably foreseeable to Harry that the conspiracy involved 400 grams or more of fentanyl, 500 grams or more of cocaine, and an unspecified quantity marijuana. *See* Doc. No. 579.  Harry was also found guilty on Counts Two, Three, and Five for possession with intent to distribute 400 grams or more of fentanyl, 500 grams or more of cocaine, and an unspecified quantity of marijuana.

As described in detail below, the jury returned a verdict against Harry that was consistent with the weight of the evidence.  Harry was found guilty because credible evidence established his guilt as to Count One, including the quantities of fentanyl and cocaine alleged in the conspiracy, and as to Counts Two and Three. Moreover, Harry chose to present evidence, calling several family members and a purported expert in various strains of marijuana. Based upon the verdict, the jury did not find the evidence presented by Harry, primarily the testimony of family members to distance him from 327 Park Avenue, to be persuasive.

For the reasons set forth below, Harry's motion should be denied.

B. <u>The Government's Case-in-Chief and Evidence at Trial</u>

The following paragraphs outline the evidence presented at trial as part of the Government's case-in-chief. Transcripts of the testimony of trial witnesses have not yet been made available on the docket. This outline is not intended to provide a comprehensive review of all of the testimony and exhibits, but rather a summary of the most relevant portions for the purposes of this response.

1. **Testimony of DEA Task Force Officer Scott Errington**

Task Force Officer ("TFO") Scott Errington with the DEA testified for the Government on October 6, 2021.  TFO Errington detailed his work as a DEA TFO in Pennsylvania, including his undercover work.  TFO Errington had no involvement in the Harry/Wiley investigation.  Based on his experience, background, and training, the Government introduced TFO Errington as an expert in drug trafficking.  TFO Errington explained what certain coded words that come up in the drug trafficking context mean in plain English. He explained that the term "kilograms" is commonly used to describe quantities of fentanyl, heroin, and cocaine, whereas the term "pounds" is used to describe quantities of marijuana.  TFO Errington described how drugs like fentanyl, cocaine and marijuana are trafficked, and how drugs are distributed in mid-sized cities, like those found in Connecticut. TFO Errington described how powder drugs, like cocaine, are diluted and "stepped on," so that high-purity cocaine can be made less pure to increase its volume through the use of cut material. Preparation of cocaine can allow for one kilogram of cocaine to be made into two kilograms of cocaine by adding cut material and repackaging the substance.  TFO Errington described how businesses, even legitimate businesses, can be used as fronts to distribute drugs,

and how various locations can be used to store and package controlled substances. He explained that, when determining who to charge with possessing controlled substances found in a stash location, personal effects found near contraband or drug paraphernalia can be valuable evidence, connecting an individual to a location or the contraband found therein. TFO Errington provided the approximate range of the prices of a kilogram of cocaine and a kilogram of fentanyl in 2021 in the Northeast, including Connecticut. He explained that one of the street names for cocaine is "white girl," that fentanyl can be referred to as "fent" or "F", and that there are other names for the substances depending on the organization and that organization's specific code.

### 2. Testimony of FBI Special Agent John Hauger

On October 11, 2022, the jury heard testimony from Federal Bureau of Investigation Special Agent John Hauger, an expert in cell site analysis. Special Agent Hauger testified about cellular site records received from T-Mobile for cellular telephones used Wiley and Harry, records for the Target Telephone, GX 170A and 170B, and records for the cellular telephone used by Harry ending -4489[1] ("the Harry Telephone"), GX 171A and 171B. Special Agent Hauger also testified about GX 173, which was admitted in full. GX 173 was a visual summary of Special Agent Hauger's analysis of certain cell site information provided by the cell phone service provider for the Target Telephone and the Harry Telephone. The data underlying GX 173 was the telephone records and cellular site data, GX 170B and 171B, for a period of April 16, 2021 until June 9, 2021. The information showed the phones' interactions with cell site towers near the site of Harry's

---

[1] DEA seized from Harry's his Apple iPhone associated with number 860-982-4489 on June 9, 2021. GX 182. The Harry Telephone was subscribed in Harry's name. GX 171A, 171B.

Action Audio business (2814 Main Street, Hartford), Harry's residence (327 Park Avenue, Bloomfield), and use of cellular towers in by the Target Telephone in Springfield, MA on May 6, 2021. Special Agent Hauger testified about the following conclusions he reached based on his analysis, each of which were depicted graphically within GX 173:

- Between April 27 and May 7, 2021, the Wiley and Harry phones utilized the same sector of the same cell cite tower near 327 Park Avenue on the following dates:

  **April 27, 2021** 3:28 PM to 4:34 PM
  **April 29, 2021** 7:05 to 11:48 PM
  **April 30, 2021** 12:00 AM to 1:39 AM
  **May 4, 2021** 8:02 PM to 8:39 PM
  **May 5, 2021** 6:41 AM to 10:16 AM
  **May 6, 2021** 9:26 PM to 11:50 PM
  **May 7, 2021** 12:04 AM to 8:50 AM
  **May 7, 2021** 3:21 PM to 5:30 PM

  GX 173-6.
- On May 6, 2021, between 11:07 and 11:11 p.m., the Wiley phone was in downtown Springfield, MA.  GX 173-7.
- The last time that the Wiley phone utilized a cell site tower near 327 Park Avenue was on May 21, 2021, between 7:51 and 8:52 p.m.  GX 173-8.
- The last time the Wiley phone utilized a tower near 2814 Main Street was between 11:09 a.m. and 4:19 p.m. on June 4, 2021.  GX 173-10.
- Between June 4 and June 8, 2021, the Harry phone utilized cell phone towers near 327 Park Avenue at various dates and times, the last being approximately 6:44 pm on June 8, 2021.  GX 173-11.

### 3.  Testimony of DEA Special Agent Andrew Hoffman

The Government's case agent, DEA Special Agent Andrew Hoffman testified on October 6-7, and October 11-12. The Court permitted certain witnesses to be called out of order and to interrupt SA Hoffman's testimony for scheduling efficiencies. SA Hoffman testified about the overall investigation and the specific evidence against Harry and Wiley. He testified regarding a

February 2021 jailhouse phone call between Wiley and Harry, phone calls and text messages intercepted occurring to and from the Target Telephone, communications found on cellular telephones seized from Wiley and Harry, including communications between the pair, and surveillance and investigatory tools utilized during the investigation. He also testified about Wiley's arrest on June 9, 2021, and the search of Wiley's residence in Norwalk, Connecticut.

*Jailhouse Call*: In February of 2021, DEA tracked Wiley's car to Yonkers, NY, where DEA learned that Wiley had been arrested by police in Yonkers, New York. Special Agent Hoffman testified regarding his receipt and review of jailhouse calls made by Wiley during his incarceration at the Westchester County Department of Corrections.

In a phone call from February 10, 2021, Wiley discussed his New York arrest with Harry:

| | |
|---|---|
| Wiley: | No bro, bro. You know what I got caught with? |
| Harry: | What? |
| Wiley: | What you think I got caught with bro? Weed? |
| Harry: | Well, you went to see that dude. |
| Wiley: | We ain't really gonna talk on the phone too much but yea. |
| Harry: | Yea, yea, yea. |

GX 130.

Wiley further instructed Harry not to interact with certain individuals so that his arrest would not interfere with their drug business:

| | |
|---|---|
| Wiley: | Yo homie with the Audi truck. |
| Harry: | Hmm. |
| Wiley: | Stay away. |
| Harry: | Okay. |
| Wiley: | Yea, yup. |
| Harry: | Okay. |
| Wiley: | Yea, Cause like when shit gets bad you know how people be switching up, they just be. |

10

GX 130.

Later in the call, Harry expressed his concern regarding the Yonkers Police having

access to Wiley's phone:

| | |
|---|---|
| Harry: | Yo they don't have a password to your phone, right? |
| Wiley: | Huh? |
| Harry: | Phone, phone. |
| Wiley: | Na they don't have the password. But bro them niggas know a lot bro. Like feel me?   For them cops to be New York cops them niggas know everything of what was going on feel me? |

GX 130.

In another jailhouse call on February 14, 2021 between Wiley and his girlfriend and co-

conspirator, Destiny Wade, Wiley learned that Harry would provide him with a new Apple iPhone

when Wiley was released from custody.

| | |
|---|---|
| Wiley: | How are you going to get me an iPhone if you spent the money? |
| Wade: | Your friend.  One of your friends is gonna get it. |
| Wiley: | Huh. |
| Wade: | One of your friends. |
| Wiley: | What? |
| Wade: | I don't remember.  One of your friends said his gonna get it.  I don't remember which one. |
| Wiley: | Who? |
| Wade: | He asked…I don't know.  I don't know his name. |
| Wiley: | What's his number? |
| Wade: | Hold on.  4489. |

Gx. 132.

The jailhouse phone call established that Harry and Wiley had a close relationship, Harry

being one of the first individuals that Wiley called from jail. Moreover, Harry intimated that he

was aware of the circumstances leading to Harry's arrest, and later told Harry that he was glad that

he did not travel with him, or else they would both in jail together. GX 130. The jail call further

11

established that Harry and Wiley were cautious not to talk over the phone for fear that their communications could be intercepted, and the physical cellular telephone seized from Wiley would likely have incriminating evidence against the pair. GX 130.

***Communications Intercepted through the Wiretap and Phone Seizures***:  Special Agent Hoffman testified that the investigation included use of a wiretap to intercept communications to and from the Target Telephone used by Wiley from April 16, 2021 through June 9, 2021. During the wiretap, DEA intercepted traditional voice and electronic communications (text messages) occurring to and from the Target Telephone that traversed the T-Mobile network.

Special Agent Hoffman introduced forty-three (43) communications, communications relevant to this case, that were intercepted over the Target Telephone through use of the wiretap. GX 2-44. This included certain communications between Wiley, using the Target Telephone, and Harry, using a telephone number ending -4489, that were intercepted through use of the wiretap. GX 2, 4, 15-16, 27, 34-36. Special Agent Hoffman also testified about his receipt and review of cellular site data received from T-Mobile for Wiley's cellular telephone, the Target Telephone, and the Harry Telephone. GX 170B, 171B.

Special Agent Hoffman testified that Sashery Feliz[2] communicated with Wiley through text messages and phone calls on numerous occasions.  For example, in a phone call between

---

[2] Feliz was later arrested as part of the DEA investigation.  On April 29, 2022, Feliz, a co-conspirator charged in Count One of the Superseding Indictment, pleaded guilty to conspiring to distribute and possess with intent to distribute a quantity of more than 500 grams but less than 2 kilograms of cocaine and an unspecified quantity marijuana. *See* Dkt. No. 338. Feliz stipulated to his offense conduct, including that she attempted to source cocaine for Wiley. *Id*.

Wiley and Feliz at approximately 8:25 pm on April 20, 2021, Wiley had a background conversation with an unknown individual related to a quantity of fentanyl that they possessed, a quantity large enough that there was "dust everywhere," "dust in my face," "all in my car," and instructions to "put your mask on when you bag that shit up . . . That's Fetty." Gx. 3.

| | |
|---|---|
| Wiley: | [Background: Yo, this is dust everywhere.] [Voices Overlap] |
| Wiley: | [Aside: Nigga!] [Voices Overlap] |
| Wiley: | [Background: I was shitting the other day at like four (4) in the morning and throwing up, bro.] |
| Wiley: | [Aside: From what?] |
| Wiley: | [Background: From this shit.] [Voices Overlap] |
| Wiley: | [Aside: You gotta put your mask on.] [Voices Overlap] |
| Wiley: | [Background: Dust got in my face, nigga.] [Voices Overlap] |
| Wiley: | [Aside: You gotta put a mask on when you bag that shit up, bro. I told you. That's Fetty.] Oh, your shit right here. Oh, I just had it! Fuck!] |
| Wiley: | [Background: This shit got dust (U/I). That shit got (U/I). Damn, you be making this cash and I don't even be done, I be trying to...] [Voices Overlap] |
| Wiley: | [Laughs] [Voices Overlap] |
| Wiley: | [Background: ...wash it away. I be like...] [Voices Overlap] |
| Wiley: | [Aside: That's funny. For what? (U/I). Oh, hold up.] [Laughs] [Pause] |
| Feliz: | [Aside: You bring me my boots (Ph) now? (Pause) Yo!] |
| Wiley: | [Background: Yo, niggas is really putting 200. Aside: Nah... That's too much, bro'.] |
| Wiley: | [Background: They ain't putting two (2)... They ain't putting 200. They can't be putting two (2).] |
| Wiley: | [Aside: That's too much, bro'. I told them...] [Voices Overlap] |
| Wiley: | [Background: There's no way they could put two (2).] [Voices Overlap] |
| Wiley: | [Aside: I don't know how they doing it, bro'.] |
| Wiley: | [Background: I know when I do...] [Coughs] [Voices Overlap] |
| Wiley: | [Background: And niggas...] [Voices Overlap] [Aside: Coughs] |
| Wiley: | [Background: It's because Hartford got garbage dope bro...] [Voices Overlap] |
| Wiley: | [Aside: Close that shit up, bro'. You got that shit all in my car.] [Coughs] |
| Wiley: | [Background: This is his bag right here.] [Aside: Coughs] |
| Wiley: | [Background: Damn, I would have brought it. But nigga, I ain't got no more bread. I would've brought the wrap. But I'ma, I'ma scrape off some (U/I) or something.] |

| Wiley: | [Aside: You copping a bracelet with this?] |
|---|---|
| Wiley: | [Background: Nigga, listen to this: I got a bracelet. The thing is that (U/I).. to put some more bread to get that shit out.] [Voices Overlap] |

GX 3. Wiley's call with Feliz, the evening of April 20, 2021, occurred shortly after the Target Telephone and Harry Telephone were both in the vicinity of Action Audio (both devices using a cellular tower located at 830 Windsor Street, Hartford, CT). GX 170B-133; 171B-146.

Special Agent Hoffman testified about the DEA's physical surveillance on April 27, 2021. The evening prior, Wiley had called a male based in Springfield, Massachusetts, using a 413 area code with a telephone number ending in -7143 ("Al Springfield"). GX 5. Special Agent Hoffman testified about Wiley's phone calls with the user of the telephone number ending -7143, stored as a contact in Wiley's telephone as "Al Springfield." Wiley had told Al Springfield that he was in Hartford and that he wanted Al Springfield to "pull up on [Wiley]." GX 5. Al Springfield acquiesced and said he would meet Wiley in two hours. GX 5. Coupled with wiretap evidence, physical and electronic surveillance, and communications between Harry and Wiley, Al Springfield was believed to be a large-scale cocaine trafficker with access to tools and materials used to package and dilute cocaine for wholesale redistribution.

***New York Cocaine Transaction in April 2021:*** On April 27, 2021, footage from a pole camera showed Wiley at Action Audio around 3:15 pm in his Mercedes Benz. GX 266. The pole camera shows an individual, who the jury could conclude is Harry, retrieve items from the trunk of a Honda Accord, a vehicle registered to Harry. GX 266. Harry then placed a bag in the trunk of Wiley's Mercedes and entered the Mercedes before it departed Action Audio. GX 266. A short

14

time later, Special Agent Hoffman observed Wiley, Harry, and Myron Brown, [3] arrive at Harry's

house at 327 Park Avenue.  Special Agent Hoffman video recorded Wiley, Harry and Brown exit

Wiley's Mercedes, Harry retrieve items from the trunk of the vehicle, and the group entered 327

Park Avenue. GX 160. Special Agent Hoffman testified regarding a phone call from the following

day, April 28, 2021, between Wiley and Brown (Brown using a telephone number ending -0334).

GX 13.   During the call, Wiley arranged a three-way call with Brown and another individual,

stored as a contact in Wiley's cellular telephone as "Wiz BK," (assigned a telephone number

ending -4084) to coordinate Brown's cocaine delivery to Wiz BK, who was located near Lenox

Ave, New York, NY.  GX 13.

| | |
|---|---|
| Wiley: | You told me to tell him to come outside.  That nigga been sitting outside. [Voices overlap] |
| Brown: | Bro', bro', bro' it say; "Zero minutes." I'm on the block. I'm ready to pull 'em up. |
| Wiley: | And I'm fucking gave you all the bread I had in my pocket and this fucking toll, I forgot all about this shit. |
| Brown: | That's why I told you [Audio skips] dollars. Tell him... tell him I'm in a blue car, man. I'm at the Lenox Ave uh.. light. |
| Wiley: | Alright. |
| Brown: | I see a white van. Tell him... tell him I'ma pull right behind the white van. |
| Wiley: | Alright. |
| Brown: | You hear me? |
| Wiley: | Hold on, I'm 'bout to connect him. [Pause] Both of you are on the phone. |
| Brown: | Yo! |
| Wiz BK: | Yo. [Voices overlap] |
| Brown: | I'm ready pulling up this white van.  You see that white van with the |

---

[3] Brown was later arrested as part of the DEA investigation.  On May 2, 2022, Brown pleaded guilty to conspiring to distribute and possess with intent to distribute a quantity of more than 500 grams but less than 2 kilograms of cocaine. *See* Dkt. No. 345. Brown stipulated to his offense conduct, including that on April 28, 2021, he transported cocaine to New York. *Id.*

|          |                                                          |
|----------|----------------------------------------------------------|
|          | hazard lights on? [Pause] It's behind the truck.  A little... a little Jeep? |
| Wiz BK:  | Alright.                                                 |
| Brown:   | I'm ready to pull up.  I'm in a blue car.                |
| Wiz BK:  | Alright.                                                 |
| Brown:   | I'll be there.  I'm at this light. I'll be there in like two (2) seconds. |

GX 19.

In a subsequent call six minutes later, Wiz BK complained to WILEY about the weight of the delivery being only 900 grams.

|          |                                                          |
|----------|----------------------------------------------------------|
| Wiz BK:  | Yeah, what's this?                                       |
| Wiley:   | You said, what?                                          |
| Wiz BK:  | I said, what's this in this bag?                         |
| Wiley:   | Is like, nine hundred (900).                             |
| Wiz BK:  | It ain't even nine (9), bro'.  That shit look like, less... lesser than that. |
| Wiley:   | Nah, it's not bro'.  Just... Bro', is like 900 grams bro'.  I told you  it's probably off whatever the... the buck 50. Whatever it is. |

GX 14.

        To provide context to the consummated transaction on April 27, 2021, the jury heard a phone call between Wiley and Feliz that occurred on April 27, 2021 at 4:58 pm, shortly after the DEA surveillance where Harry, Wiley and Brown travelled to 327 Park Avenue. GX 8. Feliz told Wiley that she could provide to him a "joint," a kilogram, that was "fire" for 33, or $33,000. GX 8. During the call, you can hear what sounds like scraping in the background. GX 8. At that time, the Target Telephone and Harry Telephone were both using cell towers that serviced 327 Park Avenue. GX 170B-170. Wiley instructed Feliz to "let [him] know about the weed too," allowing the jury to determine that the "joint" that they were discussing was cocaine. GX 8.


        ***Cocaine Transactions on May 6-7:*** On May 6, 2021 at 9:38pm, Wiley called Al

16

Springfield looking for "the joint . . . that you use to . . . to make it into another one." Wiley clarified that he was looking for the "shit that you used in" a kilogram press, cut material used to dilute one kilogram of cocaine into two kilograms of cocaine. GX 17. During this call, the Target Telephone and Harry Telephone were both using cellular towers that serviced 327 Park Avenue. GX 170-171, 173. The conversation between Wiley and Al Springfield included:

| | |
|---|---|
| Wiley: | Yo, look! I'm looking for something. Right? |
| Al Springfield: | What happen? [Voices Overlap] |
| Wiley: | You know that thing…I said, I'm looking for something. Like, you know the um, the joint [Sighs] um…, that you use to um… You know, make it into another one. |
| Al Springfield: | Yeah, yeah. You talking about the press? |
| Wiley: | Yeah. Nah, but the shit that you used in it. You know I mean? |
| Al Springfield: | Oh, oh. To use. [Voices Overlap] |
| Wiley: | Finesse with it. |
| Al Springfield: | To make it? |
| Wiley: | Mm-hmm. |
| Al Springfield: | Let me um…, call my man. I think he's the one that gets that shit. |
| Wiley: | Yeah. I need some of that shit like right now, bro'. |

GX 17.

In a second call with Al Springfield, where the Wiley and Harry phones were located in the area of 327 Park Avenue, Al Springfield confirmed that he could source cut material for Wiley (Al Springfield: "That's the shit that, you know, niggas throw in the "pitot" and all that."). GX 18. Wiley also asked Al Springfield that he see "what's up with the other thing too." GX 18. In the background of the call between Wiley and Al Springfield, a voice can be heard that a jury could find is consistent with Harry's voice. GX 18. Harry's voice was identified through testimony by Special Agent Hoffman, along with audio and video files from the cellular telephone seized from Harry.

Wiley then travelled to Springfield, Massachusetts and told Al Springfield that he was "back here" and "'bout to . . . pull in this shit now," and Al Springfield replied that he was still "two the three lights away." GX 23. Special Agent Hauger testified that the Target Telephone briefly travelled to Springfield, MA area around the time of this call, and the Target Telephone then returned to the area of 327 Park Avenue. GX 170B, 173-6, 7. Harry and Wiley then stayed at 327 Park Avenue on May 6 into May 7, with both the Target Telephone and Harry Telephone using cell towers that serviced 327 Park Avenue.

In a phone call between Wiley and a woman using a telephone number ending -9509 at 11:49 pm on May 6, 2021, after Wiley returned to 327 Park Avenue, chopping noises can be heard in the background, and Wiley acknowledged that he was chopping and "cooking some…not no food, but something else." GX 24.

| Wiley: | [Background: Chopping noise] Alright, um... how long you thing you gonna be until you get down here? |
| -9509: | Like... say, Like 10 minutes. Depending on where you want... where you want me to meet you at. |
| Wiley: | [Background: Chopping noise] A'ight, um... |
| -9509: | What you chopping something now? [Chuckles] |
| Wiley: | That's what I'm doing right now. [Chuckles] |
| -9509: | Oh okay. [Chuckles] |
| Wiley: | I'm cooking some... not no food, but something else. [Chuckles] |

GX. 24. During this call, both the Target Telephone and Harry Telephone were using cellular towers that service 327 Park Avenue. GX 170B, 171B, 173.

On the following day, May 7, 2021, Wiley made several phone calls offering to sell and distribute cocaine. At 9:11 am, just after his phone departed the area of 327 Park Avenue based on cellular site date, GX 170B, Wiley called an unknown individual with a Rhode Island area code

18

with whom Wiley had conducted business "that didn't go well" several months ago. Based on the context of the communications, the jury could conclude that Wiley was offering cocaine for sale, not marijuana, and that the pair discussed a prior cocaine transaction where the cocaine was of poor quality. GX 25.  Wiley stated that "this shit [he] got is fire" and he could sell him "a whole joint for 32K," or a kilogram of cocaine for $32,000, a price consistent with cocaine prices in Connecticut at the time. GX 25.

Later, on May 7, 2021, Wiley and Harry reconvened at the Action Audio Store. Pole camera footage, GX 268, showed Wiley and Harry conversing outside of the store around 10:55 am. GX 268. At approximately 1:34 pm, while Wiley was at the Action Audio Store, he called Al Springfield where Wiley said that he would "need like another two of them shits." GX 26. Wiley then told Al Springfield that Wiley's "people is loaded with that shit," which the jury could conclude referred to cocaine, and that Wiley was offered to purchase "four for a buck" if he brought "one hundred thousand" to a supplier, or four kilograms of cocaine for $100,000:

| | |
|---|---|
| Wiley: | Yo bruh my man... my man hit me with some... yo listen, my man hit me with some crazy shit. Like, "Yo, what up? I got four (4) on me right now. Come drop me off a buck." And I was like," Damn bruh." [Voices overlap] |
| Al Springfield: | That's beautiful. |
| Wiley: | Nah, but he want... yo, he was just he was just thirsty for the bread because he wanna to go do something.  And I was just like "Yo," He wanted it right then and there, I couldn't get up and jump in the highway right now  [Voices overlap] |
| . . . | |
| Wiley: | He really was like... he really... first he was like... like, he's like, "Yo, just give me a buck 10." Like, "Yo,.. bruh, if you coming right now bruh, just bring me one hundred thousand bruh.  Just take these shits bruh." |

GX 26.

At 1:44 pm, pole camera footage captured Wiley and Harry having another conversation outside of Action Audio before Wiley departed. GX 268. Wiley then travelled to the area of 327 Park Avenue, GX 170B, and at 1:53 pm, Harry called Wiley and told him that there were "boxes" by the "front driver side." GX 27. Harry told Wiley that "nobody is at the house" and, evincing that Wiley did not have unfettered access to the house, told Wiley to put the boxes inside the house and to, "call me when you're at the front door and I'll tell you how to get in." GX 27.

Based on pole camera footage, at 2:25 pm, Wiley returned to Action Audio, driving Harry's white Bentley SUV, while an unidentified woman drove Wiley's Mercedes. GX 268. At approximately 2:54 pm, Harry and Wiley entered a Honda Accord, with Harry, who took the driver's seat, carrying a white bag, and the pair departed the Action Audio Store. GX 268. Based on cellular site information, the pair travelled to the area of 327 Park Avenue. GX 170B, 171B.

While at 327 Park Avenue, at 3:42 pm, Wiley confirmed to Peter Munoz[4] that he had "white girl." Munoz conveyed to Wiley that he had customers interested in buying 300 grams of "white girl." GX 31.

| | |
|---|---|
| Wiley: | Yeah, what you needed?  What you needed, bro? Talk to me. |
| Munoz: | You [Clear throat] The other one, bro. |
| Wiley: | The white girl? |
| Munoz: | Yup. |
| Wiley: | How much? I got it. |

---

[4] Munoz was later arrested as part of the DEA investigation. On April 5, 2022, Munoz, a co-conspirator charged in Count One of the Superseding Indictment, pleaded guilty to conspiring to distribute and possess with intent to distribute a quantity of more than 300 grams but less than 400 grams of cocaine, and an unspecified quantity of marijuana. *See* Dkt. No. 296. Munoz stipulated to his offense conduct, including that "white girl" was coded language for cocaine. *Id*.

| | |
|---|---|
| Munoz: | No, that's what I told you, bro. Because I, I, I know two guys, you know? They are- [Voices Overlap] |
| Wiley: | All right, how much they want? [Voices Overlap] |
| Munoz: | But, but... he buy, he buy all the time 300,300,300. |
| Wiley: | 300 dollars or 300 grams? |
| Munoz: | Nah, nah, nah. Dollars no, bro. [Voices Overlap] |
| Wiley: | Grams? [Voices Overlap] |
| Munoz: | Yeah, man. |
| … | |
| Wiley: | Alright, I got it right now, he want it? |

GX 31.

Providing context to this conversation and the controlled substance discussed, Task Force Officer Errington testified that "white girl[5]" is a street name for cocaine, and that traffickers use the metric system, *i.e.* grams, in reference to cocaine. The Government's theory was that this call referenced cocaine. Notably, during this call, a voice can be heard in the background that is consistent with Harry's voice, along with a metallic chopping noise. GX 31. The Government's theory was that Harry and Wiley were jointly preparing cocaine for distribution at 327 Park Avenue. Moreover, the jury heard evidence about the layout of Harry's modest residence, along with photographs depicting the interior of the residence. GX 246.

Almost an hour later, at 4:25 pm on May 7, 2021, Wiley called an unknown female and

---

[5] Harry presented evidence through the testimony of Takisha Carter to advance a claim that "white girl" was not slang or coded language for cocaine, but instead referred to a strain of marijuana. SA Hoffman (in testimony elicited by counsel for Harry) and TFO Errington testified that, in their training and experience, "white girl" was used by drug traffickers and the subjects of wiretap investigations as common slang for cocaine. Based upon the jury's verdict, it does not appear that the jury assigned significant weight to Ms. Carter's testimony and, even if the jury credited testimony that there exists a strain of marijuana called "white girl," here, "white girl" was used by Harry, Wiley and others as coded language for cocaine in the context of the communications in this case.

conveyed that he was "in the lab right now," while metallic/machinery noise could be heard in the background of the call.   GX 33.   During this call, Wiley had a separate discussion in the background and stated "yo, this ain't going no more" and "you want me to leave this shit or take it out."  GX 33.  In the background, after Wiley asks, "you want me to leave this shit or take it out," a voice can be heard in the background that is consistent with Harry's voice. GX 33. At the time, the Target Telephone and Harry Telephone were both being serviced by cellular towers in the area of 327 Park Avenue, GX 170B, 171B, and Wiley and Harry had departed Action Audio together in a Honda Accord at approximately 2:54 pm, before returning together at approximately 5:58 pm. GX 268.

At approximately 5:59 pm, Harry and Wiley returned to Action Audio in the Honda Accord, which Harry was driving. GX 268. The pair remained in the vehicle for more than five minutes, before exiting the vehicle and entering Action Audio. GX 268. Wiley returned to the vehicle, exited the vehicle with a white bag, and placed the white bag into his Mercedes. GX 268. Harry and Wiley had an in-person conversation outside of Action Audio, and then Wiley departed Action Audio and travelled to Bridgeport. GX 268.

Later that evening, at 8:30 pm, Wiley confirmed with Harry that a transaction had occurred. GX 34. In a phone call, Wiley told Harry, "that nigga literally just got out my car as we speak," and Wiley was "about to go count the bread right now." GX 34.

***Data from the Harry and Wiley Cellular Telephones:*** The Government presented evidence related to the seizure of the Target Telephone from Wiley, an Apple iPhone, and the Harry Telephone from Harry, also an Apple iPhone. Data was extracted from each cellular

22

telephone by Norwalk Detective Nathanial Paulino, who testified on October 6, 2022. The physical cellular telephones were entered into evidence. GX 180 and 182. Communications between Wiley and Harry extracted from each cellular telephone, along with attachments to those conversations, were also entered into evidence. GX 302; GX 352. Special Agent Hoffman testified to his review of content extracted from the Wiley and Harry cellular telephones.

On May 3, 2021, just preceding the events of May 6-7, described above, Wiley and Harry communicated by Apple iMessage (which is not intercepted through use of the wiretap). GX 325, 326, 327, 355. Harry sent Wiley a voice memo related to their drug transactions:

Harry:     Yo. I keep on saying the same thing to you and I don't think you understand me. There is so much. Tie want his money to go pick up his car. He's asking me for money. The dudes there give me the stuff; they are calling me for their money. It's the third of the month. All bills is due. That ... l took all my money and pay for some of product. The profit from the first set of product, I already give that to you and it's not coming back. I already took that in my mind as a loss. That's why I wasn't ... didn't want to do it. So that seven grand and change is gone. That's how I see it. Then plus another nine hundred dollar plus another two hundred dollar plus another hundred dollar plus another ... all of that add up. When you do the math between everything, its ten racks in one month that's gone. Who  akes 10,000 dollar in one month to just give it away? Nobody, so what I'm saying to you and you keep saying you not making nothing. You already make 10,000 dollar in profit off of me. Why should you make a dollar by helping me? That's your selfish greedy mind and you're not getting it. That's why I keep telling you stop your bullshit. That's why nothing that is involve me right now is leaving my sight. Nothing is leaving my sight.

           So when you call me, know that either you helping me because you already make money or if you are not making no money, don't call me for nothing. If you feel that you need to make some money, do not call me for anything. Don't ask me for no favors. Don't ask me to ... that your people want noth ... don't do nothing. Let me sit. Let me suffer my own consequence by doing shit every time you ask for something and give it to you. And it's not going to happen cause I have to take of all these people and that's my my word on

> everything because I'm not putting nothing out there for somebody to come
> and keep coming. And theygoingto come and yo talk to my son, "where you
> dad?", "he not here da dah da". No, I don't have no time for that. So nothing
> in my possession is going nowhere until somebody pull up money or you
> said, "yo let's ride and we go give it to them." They hand you the money.
> You hand it to me and we drive and come back. You want to do it that way,
> it's fine. Other than that, don't call me for nothing. Other than you pull up,
> we do what we do. We ... we ... that's it. Anything else to do with product,
> I don't want to hear it. I don't want you to confuse me. I don't want you
> (stutters) to be upset. I don't want you to upset me. I don't want none of that.
> Just let me do what I do. Thank you.

GX 326-327. Wiley replied that "that shit u gave me was stepped on 3xs" – "that's why none my

people wanted it" – "u was selling that shit for 33.00" – "stop tyna play me like I'm dumb." GX

325; 355. Wiley later wrote "I'm at the shop need my boy machine," and Harry replied, "Not a

problem machine will be there shortly or if you wanna pick it up at my house I am here by will be

there sharply I do have some stuff to make." GX 325; 355. These communications, including

reference to a machine, were mere days before Wiley, with Harry in the background, were recorded

on intercepted communications using a metallic machine during discussions related to cocaine

distribution.

     On May 16, 2021, at 3:32 pm, Wily sent a voice note to Harry that he had a "play for the

F," fentanyl, referred to as "the other shit":

> Wiley:        Yo bro. What are you doing bro? I got a play for  the  F nigga. Like for
>                the  other shit bro. What you doing? Hit me bro.

GX 360.

     Harry replied at 4:39 pm, "I'm on my way." GX 333; 359. Wiley asked Harry, "Bro I need

u to grab something before u come." GX 333; 359. Harry replied, "But I was already on my way

I just make some stuff to get some money." GX 333; 359. Based on cellular site data, Harry travelled from Action Audio to 327 Park Avenue and then to Wiley's apartment in Norwalk, Connecticut. GX 171B. At 6:37 pm, Harry wrote Wiley, "I'm here," and sent a photograph depicting the exterior of Wiley's apartment building. GX 333; 359.

On May 17, 2021, Harry wrote to Wiley, "I was telling you a man's they're full of shit because my people are the one usually turn shit down end we did 65% not 50 so there should be no problem but my guy will take it" – "but the other thing my people they are calling me so that Brad I was trying to make it to 10 racks to give it to them so I can get my shit for 31." GX 336; 363. Harry's messages to Wiley are consistent with pricing related to the distribution of cocaine, and quantities and percentages of cut material used to dilute cocaine for kilogram-quantity wholesale distribution. Wiley replied with a voice memo related to the quality of cocaine that the pair was attempting to distribute:

| | |
|---|---|
| Wiley: | Yo. I already know but I be spazing the nigga because he had me cook all that shit up and he didn't buy it but the reason why he was mad because I showed him the shit, your shit that I had cooked for you which your shit was like that gold and yellow color and that shit was white. He was like yo this shit to white bro. This some cut shit. I don't want this shit...da da da. Got into it with him like we were arguing (u/i) I just left bro. I can't force that nigga to buy that shit. But I sold an ounce out of it and there is three ounces left. So I mean I sold an ounce out of it so whatever the difference off a hundred is left. I um sold that little thing so I am just waiting for my boy to grab the two hundred. The only thing that would be missing if my man grab the two hundred is the two ounces which you could just come get now from the house. The two or three ounces whatever is left so he had a hundnet (phonetic) of the hard and (u/i) I sold 28 so whatever the difference is of that and that should be it. |

GX 364.

The next day, on May 18, 2021, the pair had further Apple iMessage communications related to wholesale cocaine distribution. GX 338; 366. At 4:17 pm, Wiley sent Harry a voice note:

> Wiley:  Yo bro ... we gotta ... yo my my man on his way back to me. He said he don't want it. He said it's not the same. He said he don't want it He want his money back and he say he not about to take no L like this. He said that he want his money back so we got to give him his money back.

GX 367. Harry replied by sending Wiley a photograph of his username for an online payment platform, and Wiley told Harry that he intended to "pull-up" at Harry's shop. GX 338; 366. Beginning at 4:19 pm through 4:39 pm, Wiley sent a series of voice memos, GX 369-373:

> Wiley:  Bro. Listen to what I am telling you bro. This nigga is wiling (phonetic) on me bro right now like he's bugging like he want his money back. He said this not the same shit like just call this nigga "Forty" whatever. He about to bring this shit back bro. He don't want it. He said he want his money back.

GX 369.

> Wiley:  Like he's gonna meet me at the shop. That way there is nobody missing nothing. There is no money missing like you text me paragraphs, he texting me paragraphs bro. I don't got time for this bro. I told the nigga to just pull up, get his shit back. You do the shit you doing with Forty bro.

GX 370.

> Wiley:  Yo. And I'm over here with my man that you gave the sample to. His peoples need something but they don't want the shit that you give them a sample of because that shit not it. I'm over here with him right now.

GX 372.

| Wiley: | Yo. What are we doing? I'm about to pull up at the shop bro. like this my main customer bro. If it was anybody else, I'd I say fuck it they did that they ... I'm saying. But him I can't do him like that bro. He spend too much money with me bro. |
|---|---|

GX 372. Wiley further sent text messages that "[Wiley's] boy is not taking the 200" – and "he want jus money back." GX 338; 366. In a communication intercepted over the wiretap of the Target Telephone, Wiley called Harry later that evening at 9:57 pm to tell Harry, "your boy not fucking with me no more." GX 35. Harry told Wiley that he would call him later that evening. GX 35.

On May 22, 2021, Wiley and Harry were intercepted, in a voice communication over the Target Telephone, discussed wholesale drug distribution. GX 36. In coded language, Harry told Wiley, "When you drive all these tires and they get flat. When these niggas realize that it flat, you know nobody gonna call you back ever again." GX 36. Based on the evidence presented at trial, a jury could conclude that Wiley and Harry were discussing weak cocaine that had been "stepped on" or diluted too much, resulting in dissatisfied customers. Wiley and Harry then discussed pricing consistent with the sale of kilogram quantities of cocaine and Wiley, in coded language, further discussed diluting cocaine for wholesale distribution, "He said, 'if you don't do it like that, it's gonna fuck up cause you have chunks and shit.' He said, 'You can't just mix it with your hand, you gotta put it... You gotta put the fruit in the blender and blend it all the way up, til it can't blend no more'. GX 36.

Later that evening, May 22, 2021, Wiley called Al Springfield to source fentanyl, the "F":

| Wiley: | Ain't nothing.  Aye yo, look. Remember that thing I was talking to you about when we had hollard in the club.  Not with weed, not with you, not your lane. But the lane I been, I been dealing with. |
|---|---|
| Al Springfield: | Yeah, yeah. Yeah. |

| Wiley: | You got access to that right now. |
| Al Springfield: | I mean, what you was talking about? You not talking about the [Stammers] Effie [Ph]. You talking about the actual shit? |
| Wiley: | Yeah, yeah. Yeah, that. |
| Al Springfield: | Alright, let me see.  Let me um... Damn, let me see... [Voices Overlap |
| Wiley: | Nah,  nah, nah. Nah, I'm talking about the um... [Sucks Teeth] Not what I grabbed off you before and not what you fuck with. The other lane. |
| Al Springfield: | Yeah, yeah. Some of that dog food. [Pause] |
| Wiley: | Yeah, the F. Yeah. |
| Al Springfield: | Let me see.  Yeah, yeah. Let me see. Let me um...  Let me call my man and see if he got some. |
| Wiley: | I got... Alright, I got something... A play we could make some bread real quick. |

GX 37.

While there was some crosstalk on the call, the call is clear that the substance referenced is not

marijuana ("weed") and not Al Springfield's "lane" (established through multiple intercepted

communications between Wiley and Al Springfield to be wholesale quantities of cocaine), but

fentanyl. Because the parties are speaking in coded language, Al Springfield confirmed whether

Wiley was referring to the "actual shit" or "dog food," slang for heroin. But instead, the parties

agree that they are discussing fentanyl, the "F."

On May 28, 2021, Wiley told Al Springfield that he had a source from whom he received

two kilograms of cocaine who was offering him ten kilograms of cocaine ("Yeah but he is saying

that now he wants me to grab ten of them at that, but I'm only grabbing two myself and my man

was grabbing a couple of them shit.") GX 40. Wiley said that if Al Springfield could source ten

kilograms of cocaine at a better price, they would need to discuss that prospect ("Bro, if you can

get ten for better than that, [n-word] then we gonna need to holla at you."). GX 40. The timing of

this fentanyl-related call between Wiley and Al Springfield coincided with communications between Harry and Wiley where the pair discussed weak cocaine that was unsatisfactory to customers.

   ***Harry's Communications with "Bro God Ja":*** Special Agent Hoffman testified that Harry's phone also contained Apple iMessage communications between Harry and a telephone number ending -4300, listed as a contact "Bro God Ja." On May 1, 2021, Bro God Ja inquired of Harry, "My boy want to know what time to pull up." GX 388. Harry replied with a video and wrote "still have it product is one of the hardest to move right now so work with me at work with you guys you don't work with me I'll give it back and start over something for us all I can say I put too much out there nothing is back in very frustrated." GX 388. In the video recording sent by Harry, with metadata showing its creation by Harry's phone on that date and time, Harry displayed what appeared to be a kilogram quantity of cocaine, and Harry's voice narrated the video recording.



GX 389

***Harry's Communications with "Does Rus":*** Special Agent Hoffman testified that Harry's phone also contained Apple iMessage communications between Harry and a telephone number ending -2145, listed as contact "Does Rus." GX 391. On June 6, 2021, Harry sent a voice memo to Does Rus "There some product that I'm calling you to show you. There's some product, twenty-five dollar down the line. And um, some other product - the white girl. Eleven dollar per." As testified to by TFO Errington, "white girl" is common slang for cocaine. Harry also sent videos

depicting marijuana. GX 393-394.

*Harry Phone Data Evincing Harry's Control and Residency at 327 Park Avenue*: Special Agent Hoffman testified that Harry's phone also contained a litany of messages to various women and other individuals where on April 12, 2021, May 14, 2021, May 24, 2021, May 25, 2021 and June 4, 2021, Harry told these individuals that he lived at, or was present at, 327 Park Avenue. GX 402, 407-410. Communications were also found related to Harry's booking of the Greenwich hotel room for the night of June 8, 2021, where he listed his residence as 327 Park Avenue. GX 403. The electrical bill for 327 Park Avenue was in Harry's name on June 9, 2021, when the residence was searched. GX 148A, 148B.

Harry's white Bentley Bentayga was also insured to 327 Park Avenue, effective May 11, 2021. GX 421. So was Harry's license to possess a pistol on the State of Connecticut. GX 470A, 470B. On June 2, 2021, days before the search of 327 Park Avenue, Harry attested under the penalty of false statement in a business filing with the Secretary of the State of Connecticut, that his residence was 327 Park Avenue, Bloomfield, Connecticut. GX 469A, 469B.

*Harry's Control of Video Surveillance at 327 Park Avenue*: The search of Harry's cellular telephone also revealed that he controlled video surveillance systems that monitored both the exterior and interior of 327 Park Avenue. GX 412, 417-420, 422. Special Agent Ryan McHugh testified that there was a video surveillance system in operation at 327 Park Avenue when it was searched on June 9, 2021, the monitors were located in the first-floor bedroom and photographed. GX 246. But Harry could also remotely control and monitor the internet-connected interior Wyze surveillance system and the exterior Swann surveillance system, and applications to control those

31

systems were present on Harry's cellular telephone. His control and use of these systems were also corroborated by a witness that he presented in his defense, Nikola London. Harry's control and use of these video surveillance systems support his control of the first-floor bedroom at 327 Park Avenue, and his ability to monitor those who entered and exited the premises in real-time.

Communications between Harry and Wiley also refuted the idea that Wiley had unfettered access to the residence. For example, on April 30, 2021, in a communication intercepted over the Target Telephone, Harry instructed Wiley to meet him at the house. GX 15. Shortly thereafter, Wiley called Harry, told Harry he was lost, and asked Harry for the address of the house (Harry replied, "327"). GX 16. Later, on May 7, 2021, in an intercepted communication, Harry told Wiley that he would instruct him how to gain entry to the house, further demonstrating that Wiley could not access the residence without authorization by Harry. GX 27.

***June 9, 2021 search arrest at Wiley's residence:*** Special Agent Hoffman testified about his role on June 9, 2021 when DEA conducted multiple searches and arrests.  Specifically, he testified about executing a search warrant at Wiley's apartment at 200 Glover Lane in Norwalk, CT.  Investigators did not find any controlled substances in the apartment, but they seized jewelry that included a watch, bracelet, rings, and necklaces. Special Agent Hoffman searched Wiley's car, a Mercedes Benz AMG, and found a bag containing crack cocaine.

### 4.   Testimony of DEA Special Agent Ryan McHugh

DEA Special Agent Ryan McHugh, testified on October 13, 2021 about his participation in the search of 327 Park Avenue, and the resulting seizures of substances and paraphernalia from within the premises.  Throughout his testimony, the jurors saw a number of physical exhibits which

32

Special Agent McHugh testified were found in the first-floor bedroom, which contained Harry's personal belongings, including over a kilogram of fentanyl (found in a Burberry box under the bed), nearly a kilogram of cocaine mixed with phenacetin (found in an orange Home Depot bucket), approximately three kilograms of marijuana. GX 229 and 230 (fentanyl), 231 (cocaine/phenacetin), 232 (marijuana).[6] Special Agent McHugh further testified that he located more substances and paraphernalia in the kitchen of 327 Park Avenue.  He further described finding in the kitchen of the residence 113 grams of lidocaine and caffeine, roughly half a kilogram of cocaine and phenacetin, 632 grams of various cutting agents, presses, and a large roll of plastic wrap, along with over a kilogram of purported marijuana found in orange buckets in the basement. GX 233-245 (physical exhibits of scale, small press, sifter, tools, a large roll of plastic wrap, large wooden press, large press tool, small wooden press, lidocaine/caffeine mixture, cocaine/phenacetin mixture, various cutting agents, marijuana).

The jury reviewed photographs of 327 Park Avenue taken on June 9, 2021.  Special Agent McHugh testified that the following photographs depicted the cocaine seized in Harry's bedroom from the orange bucket, and the Burberry box found beneath the bed containing fentanyl:

---

[6] The identity of the substances contained in Government's Exhibits 229 (fentanyl), 231 (cocaine/phenacetin), and 232 (marijuana) were confirmed through the testimony of DEA Forensic Chemist Brian Hall. *See also* GX 452, 454. The identity of the substances contained in Government's Exhibits 241 (lidocaine/caffeine), 242 (cocaine/phenacetin), and 243 (no controlled substance) were confirmed through the testimony of DEA Forensic Chemist Jennifer Skuches. *See also* GX 456-458. The identity of the substance contained in Government's Exhibit 230 was confirmed by DEA Forensic Chemist Maolin Li. *See also* GX 453. The Government did not present testimony related to the analysis of the substances contained in Government's Exhibits 232, 250-252.



GX 246-9; GX 246-10.

Further describing the scene in the kitchen at 327 Park Avenue, Special Agent McHugh testified about finding various cut materials and other narcotics distribution materials located in the kitchen:



GX 246-17; GX 246-18.

In the bedroom located on the first floor of the residence, Special Agent McHugh Special Agent found $4,260 in currency (money that Harry's sister, Onika Harry, testified was controlled and possessed by Harry). Two Apple iPhones were found in the first-floor bedroom (though they were

not searched). The first-floor bedroom also contained personal mail, documents and receipts addressed to or associated with Harry. GX 220B, 224, 225. A notebook containing passwords to online accounts used by Harry was also found in a nightstand in the bedroom. GX 226. A Springfield Armory nine-millimeter pistol magazine was also found in a nightstand in the first floor bedroom. GX 241. *See also* GX 246-7.

Harry was not present at 327 Park Avenue but was arrested that same morning in Hartford, Connecticut. Seized from Harry was a Springfield Armory nine-millimeter pistol and magazines. The magazines seized from Harry upon his arrest, GX 263, were the same as that found in Harry's first floor bedroom at 327 Park Avenue, GX 247.

***Evidence Presented by Harry***: Harry chose to present evidence, including the testimony of several family members. The following family members testified: Harry's sister, Onika Harry; Harry's son, Kenaiee Harry; Harry's cousin, Nikola London; Harry's brother, Abdul Kabal, and the mother of Harry's children, Stephanie Smith. The testimony of Harry's family members largely claimed that while 327 Park Avenue was a Harry family residence, Harry actually resided at a home in nearby Windsor, Connecticut with Stephanie Smith and Kenaiee Harry. Nikola London, who resided at 327 Park Avenue in the spring of 2021 and was present during the June 9, 2021 search, largely claimed that Wiley had unfettered access to the residence, though she did not observe any drug activity. Harry also presented the testimony of an investigator, John Koch, to introduce certain records to support that Harry did not reside at 327 Park Avenue. Harry further presented the testimony of Takisha Carter, to support that the term "white girl" may refer to a strain of marijuana, though Ms. Carter testified that she had never encountered the strain, nor had

she observed it in Connecticut.

On cross-examination, Onika Harry agreed that money that was found in the first-floor bedroom was controlled by Harry. Nikola London agreed that Harry, at times, used the first-floor bedroom and that he remotely controlled the video surveillance at the residence and knew when individuals were coming and going from the residence (and inside of the residence). Stephanie Smith agreed that, between April and June of 2021, Harry frequently stayed at 327 Park Avenue.

Based upon the verdict, the jury did not appear to assign significant weight to the witnesses and evidence presented by the defendant.

II.    **DISCUSSION**

A.  **Harry's Rule 29 Motion Should be Denied**

In challenging the sufficiency of the evidence in his Rule 29 motion, Harry claims that the Government's evidence failed to support his conviction on Count One (relating to conspiracy to possess and possess with intent to distribute quantities of fentanyl and cocaine), and his convictions on Counts Two and Three for possession with the intent to distribute fentanyl and cocaine.

With respect to Count One, Harry claims that there was insufficient evidence that he entered the fentanyl prong of the conspiracy, despite the presence more than a kilogram of fentanyl in his bedroom. Def. Mem. at 3. Harry argues that because Wiley, in a separate trial, was not unanimously found responsible for 400 grams or more of fentanyl, Harry should likewise not be found responsible, despite the unanimous finding by the jury in his case. *Id*. Similarly, Harry claims there was insufficient evidence to convict on the cocaine prong of Count One. Def. Mem. at 5-6.  Harry ignores his conversations with Wiley related to wholesale kilogram quantities of

36

cocaine, intercepted communications where Harry can be heard in the background of cocaine-related conversations where cocaine was being processed and packaged for sale, and more than a kilogram of cocaine found in his bedroom.

With respect to the possessory charges, Counts Two and Three, Harry claims evidence was insufficient to support his constructive possession of the fentanyl and cocaine found in his bedroom. Def. Mem. at 7. Harry argues that the jury needed to speculate that he possessed the fentanyl and cocaine, found amongst Harry's personal items in his bedroom where, according to cell site evidence, he was present the evening prior to the search. But rather than accept the rational inference made by the jury based upon the evidence, Harry seeks a judgment of acquittal based on his own unsupported speculation that Wiley somehow planted the fentanyl and cocaine completely unbeknownst to Harry, without detection by Harry's family members who lived at the residence or by Harry's video surveillance system.

For the reasons set forth below, his Rule 29 motion should be denied.

### 1. Governing Law

#### a. Sufficiency of evidence

When the defendant challenges the sufficiency of the evidence, a defendant bears a "very heavy burden." *United States v. Biday*, 804 F.3d 558, 572 (2d Cir. 2015); *see also United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007). Therefore, when deciding a Rule 29 motion for acquittal, the Court must view all evidence in the light most favorable to the Government and credit every inference that the jury may have drawn in favor of the Government. *See, e.g., United States v. Silver*, 864 F.3d 102, 113 (2d Cir. 2017); *United States v. Downing*, 297 F.3d 52, 56 (2d

Cir. 2002).  The Court must also recognize "that the government's evidence need not exclude every other possible hypothesis."  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (internal citations and quotations omitted).

"[T]he law draws no distinction between direct and circumstantial evidence" and "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstantial evidence are reasonable."  *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005).  Because there is rarely direct evidence of a person's state of mind, "the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom."  *Id.* at 189; *see also United States v. Crowley*, 318 F.3d 401, 409 (2d Cir. 2003) (noting that "[t]he state of a person's mind is rarely susceptible to proof by direct evidence.").  Indeed, "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008).  Moreover, a jury's decision to convict may be based solely on circumstantial evidence and any reasonable inferences based upon the evidence.  *See United States v. Snow*, 462 F.3d 55, 66 (2d Cir. 2006); *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008).

In this regard, on a Rule 29 motion, the Court may not assess witness credibility, resolve inconsistent testimony against the verdict or otherwise weigh the significance of the evidence.  *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).  The jury is "exclusively responsible" for determinations of witness credibility and is free to credit all or part of the testimony of a given witness.  *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993).  "[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United*

*States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).  When there are competing inferences, courts "must defer to 'the jury's choice.'"  *Eppolito,* 543 F.3d at 45.

In short, a court may not disturb a conviction on grounds of legal insufficiency as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal citations and quotations omitted).   "The ultimate question is not whether *we believe* the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find*."  *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) (emphasis in original).

The Second Circuit has made clear that the strict Rule 29 standard is "necessary to avoid judicial usurpation of the jury function."  *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984).  "It is irrelevant that the judge conducting such a review personally feels that he or she would not have found guilt upon such evidence."  *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004).  In other words, the question in a Rule 29 analysis is not whether the trial court "would" find the defendant guilty, but rather, whether it "could" find the defendant guilty.  *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 574 (2d Cir. 1961).  Rule 29 thus must not be used as a vehicle for the trial court to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn from the evidence for that of the jury.  *See United States v. Guadanga*, 183 F.3d 122, 129 (2d Cir. 1999); *Mariani*, 725 F.2d at 865.

**b.  Sufficiency of evidence in a conspiracy case**

This "high degree of deference [that the Court] afford[s] to a jury verdict is 'especially important when reviewing a conviction of conspiracy.'"  *United States v. Anderson*, 747 F.3d 51,

72-73 (2d Cir. 2014) (internal citations and quotations omitted).  "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Anderson*, 747 F.3d at 73 (internal quotation marks omitted).  The "agreement [to participate in the conspiracy] may be inferred from the facts and circumstances of the case[,]" and "[b]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *United States v. Wexler*, 522 F.3d 194, 207-08 (2d Cir. 2008) (internal quotation marks omitted).  Moreover, "[s]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general." *United States v. Mariani*, 725 F.2d 862, 865-66.

**2.   The Government's evidence was sufficient as to the fentanyl conspiracy conviction.**

Despite the jury's verdict to the contrary, Harry contends that there was insufficient evidence to support his conviction for the fentanyl aspect of the conspiracy. This assertion is contradicted by the evidence put forth at trial, as detailed at length above.  As the jury was instructed, Harry had to knowingly and willfully entered into an unlawful agreement with at least one other individual from sometime between January 2020 through June 9, 2021, to conspire to distribute and to possess with intent to distribute fentanyl.  Importantly, the Government need not have convinced the jury that Harry ever actually possessed or distributed fentanyl.  Instead, the evidence must only show that he participated in a conspiracy in which some quantity of fentanyl was reasonably foreseeable. But, clearly, based upon his conviction on Count Two, the jury

credited evidence to find that Harry knowingly possessed the kilogram of fentanyl found in his bedroom. Against this backdrop, the trial evidence provided a broad basis upon which the jury could have rationally found Harry guilty for conspiring to distribute and possess with intent to distribute 400 grams or more of fentanyl.

### i.   Wiley's fentanyl-related phone call on April 20, 2021

In a phone call on April 20, 2021, GX 3, the jury heard Wiley and an unidentified coconspirator discuss fentanyl. Wiley, in his car, complained that there was "dust everywhere," "dust in my face," and told the male to "put your mask on when you bag that shit up . . . That's Fetty." *Id*. The jury could infer from this call that Wiley, Harry's close confederate, was involved in the fentanyl trade and discussed with the unknown male the distribution of fentanyl because Hartford "dope" (*i.e.*, heroin) was garbage. Accordingly, this establishes *Wiley*'s role in fentanyl distribution. Moreover, based on cellular side evidence, both Wiley's cellular telephone and Harry's cellular telephone were in the vicinity of Action Audio (both using a cellular tower located at 830 Windsor Street, Hartford, CT) approximately forty minutes prior to the call. GX 170B-133; 171B-146.

Harry concedes that "Wiley's cellphone calls and electronic communications established his interest in obtaining and distributing fentanyl." Def. Mem. at 3.

### ii.  Wiley voice memo to Harry on May 16, 2021

A voice memo sent by Wiley to Harry on May 16, 2021 provides evidence of Harry conspiring to distribute fentanyl with Wiley. Specifically, Wiley sent Harry a voice memo at 3:32 pm that he had a "play for the F – the other shit." GX 360. Harry argues that there was no evidence

that Harry "responded in a way that would have allowed the jury to conclude that he agreed to join Wiley's venture into fentanyl." Def. Mem. at 3. However, Harry responded to Wiley by text message at 4:39 pm: "I'm on my way."  GX 359-002.  Harry, based upon cellular site evidence, travelled from Action Audio, to 327 Park Avenue, to Wiley's apartment in Norwalk, Connecticut. GX 171B. Harry also sent Wiley text messages that he had arrived outside of Harry's apartment, including a photograph of the exterior of the building. GX 359-006.

The jury could infer that "F," was specifically referenced as the "other shit" to differentiate it from cocaine or marijuana. Harry's response to Wiley's "play for the F," allowed for the rational conclusion that Harry was a member of the fentanyl prong of the conspiracy, including traveling to meet with Wiley in Norwalk in furtherance of fentanyl distribution.  *See United States v. Temple,* 447 F.3d 130, 136–37 (2d Cir. 2006) (In adjudicating a motion for acquittal, the Court must credit "every inference that the jury might have drawn in favor of the government.").  In light of the evidence, a rational juror could conclude that these communications show Harry and Wiley jointly participating in the conspiracy to distribute fentanyl.

### iii.  Wiley's call with Al Springfield on May 22, 2021

Wiley's call with Al Springfield on May 22, 2021, provided further clarity of the three substances being trafficked in the drug conspiracy in which Harry was a participant: fentanyl, cocaine, and marijuana. Specifically, in a call with Al Springfield on May 22, 2021, Wiley inquired about Al Springfield's access to fentanyl. GX 37. A rational juror could conclude that Wiley made clear that he was looking to source additional fentanyl, the "F."

42

| | |
|---|---|
| Wiley: | Nah,  nah, nah. Nah, I'm talking about the um...  [Sucks Teeth] Not what I grabbed off you before and not what you fuck with. The other lane. |
| Springfield: | Yeah, yeah. Some of that dog food. [Pause] |
| Wiley: | Yeah, the F. Yeah. |

GX 62. In this call, Wiley lays out a roadmap of the substances involved in the conspiracy: marijuana ("weed"), cocaine (Al Springfield's typical "lane"), and fentanyl (the "F").

Notably, this call occurred subsequent to an intercepted call between Harry and Wiley, which occurred earlier that same day, where the pair discussed wholesale distribution of cocaine. GX 36. The pair realized that their cocaine was "flat," meaning that it was not potent, and that the pair needed to learn to better mix, or "blend", product that they were preparing. GX 36. Al Springfield had been used by Wiley to source product on dates where Wiley and Harry were working in tandem, including: April 26, 2021 where Wiley sourced from Al Springfield in advance of the New York cocaine transaction that was prepared with Harry at 327 Park Avenue (Wiley, with Harry also at 327 Park Avenue, told Feliz that he had just sourced cocaine); May 6, 2021 where Wiley sourced cut material from Al Springfield, travelling from 327 Park Avenue to Springfield, later to return to 327 Park Avenue to package cocaine with Harry for distribution.

### iv.  Fentanyl seized at Harry's home

On June 9, 2021, DEA investigators found over a kilogram of fentanyl under Harry's bed in his bedroom at 327 Park Ave, along with cocaine and marijuana. The three substances found in Harry's residence were the same as those discussed by Wiley and Harry through coded language in intercepted communications or voice memos sent between the pair, including reference to "the F" on May 16, 2021, and the same as those substances discussed by Wiley and Al Springfield on May

22, 2021. GX 37.

The jury could rationally conclude Harry's use and control of 327 Park Avenue also provided evidence of the conspiracy with Wiley to distribute the three substances that were found at his residence, substances discussed by Wiley and Harry using coded language. Wiley and Harry were frequently together during April into May of 2021, including instances where, based on physical and electronic surveillance, the content of intercepted communications and background sounds, the pair packaged controlled substances for distribution. GX  18, 31, 33 (intercepted communications where Wiley discusses cocaine preparation, in which Harry can be heard in the background). Harry's residence contained presses, cutting agents, tools for packaging drugs, along with fentanyl, cocaine and marijuana. Where there was evidence of Harry's use and control of the first-floor bedroom at 327 Park Avenue – a room where he stored personal documents, identification, and a firearm magazine – Harry also used video surveillance to monitor the residence. A rational juror could couple the communications between Harry and Wiley, along with the other evidence presented at trial, with the items found at 327 Park Avenue and conclude that Harry conspired with Wiley to distribute 400 grams or more of fentanyl.

Physical possession of 400 grams or more of fentanyl is not required in order to provide the quantity reasonably foreseeable to Harry based upon his own conduct in the conspiracy, or the conduct of others. But more than 400 grams of fentanyl was found in Harry's bedroom. While Harry claims that he cannot be found responsible for more than 400 grams of fentanyl because Wiley was acquitted of that conduct, a rational juror could conclude that Harry's role in the conspiracy, including the fentanyl he possessed at 327 Park Avenue, involved 400 grams of fentanyl based upon

*what Harry knew* and reasonably should have foreseen *from his own conduct*, and that of other members of the conspiracy. This Court has already rejected Harry's claims related to collateral estoppel. In any event, where there was sufficient evidence that Harry and Wiley conspired together to distribute fentanyl, Harry's own conduct – *i.e.*, obtaining and possessing 400 grams or more of fentanyl in his bedroom – provides a sufficient basis as to Harry's knowledge and reasonable foreseeability related to the fentanyl quantity, irrespective of Wiley's knowledge or reasonable foreseeability as to the quantity of fentanyl.

Accordingly, Harry's claim of insufficient evidence for his conviction for conspiracy to distribute and possess with intent to distribute some quantity of fentanyl is baseless.

### 3. The Government's evidence was sufficient as to the cocaine conspiracy conviction, in a quantity of 500 grams or more.

In his motion, Harry claims that there is a "dearth of evidence … of Harry's involvement with cocaine." Def. Mem. at 6. As discussed below, the Government presented ample evidence of Harry's role in the conspiracy to distribute and possess with intent to distribute 500 grams of more of cocaine.

#### i.      April 28, 2021 cocaine delivery

As described above, Harry and Wiley jointly prepared cocaine on April 27, 2021 in advance of Myron Brown's delivery of cocaine to a New York customer, Wiz BK. After the transaction was consummated on April 28, 2021, Wiz BK complained that the delivery was only 900 grams. GX 14.

On April 27, 2021, Harry, Wiley and Brown coordinated at Action Audio and travelled

together by car from Action Audio to 327 Park Avenue, as captured by physical and electronic surveillance and pole camera footage. GX 160, 266. At Action Audio, Harry was observed retrieving a bag from the trunk of his Honda Accord and putting the bag into Wiley's Mercedes. GX 266. When the group arrived at 327 Park Avenue, Harry retrieved the bag from the trunk of the Mercedes and the group proceeded into Harry's residence.

For context, the evening before, Wiley sourced from Al Springfield, a cocaine trafficker, while Wiley was in Hartford. GX 5. While at 327 Park Avenue, Wiley spoke with Feliz while he was with Harry at 327 Park and, in coded language, told her that he had just sourced cocaine. GX 8. A rational juror could conclude that Harry, along with Wiley and Brown, conspired to distribute 900 grams of cocaine to Wiz BK in New York.

### ii.    May 6-7, 2021 cocaine preparation

The Government's evidence from May 6-7 of 2021 also shows Harry's participation in the distribution of kilogram quantities of cocaine.  As described above, cell site data showed that Harry and Wiley together in the vicinity of 327 Park Avenue from approximately 3:32 pm to 9:05 pm. GX 170B, 171B, 173. In a call where a jury could rationally conclude that Harry's voice is heard in the background, Wiley spoke with Al Springfield at approximately 9:38 pm to inquire about purchasing cutting agent, GX 18, before travelling to Springfield, MA.  GX 173.  After the brief Springfield trip, Wiley returned to 327 Park Avenue and made a phone call where Wiley joked that he was chopping and "cooking some…not no food, but something else."  GX 24.  Harry and Wiley remained together at 327 Park Avenue from 12:04 am to 8:50 am.  GX 173. The jury also heard testimony related to the size of the residence, a fairly small home where, as depicted in

photographs, it would be difficult for someone on the first floor to be unaware of what was occurring in the kitchen (both visually and audibly). See GX 246.  A rational jury could conclude that Harry and Wiley spent the night preparing kilogram quantities of cocaine for distribution, and the following morning, Wiley contacted potential cocaine customers.

On May 7, 2021 at 9:11 am, shortly after departing 327 Park Avenue, Wiley called an unknown individual with a Rhode Island area code that he conducted with several months earlier "that didn't go well."  GX 25.  During the call, Wiley made clear that the product being discussed was not marijuana. GX 25. Wiley stated that "this shit [he] got is fire" and he could sell him "a whole joint for 32K."  GX 25.  A rational juror could conclude that, after Harry and Wiley prepared cocaine for distribution, the pair had kilogram quantities of cocaine available for distribution, as evidenced by Wiley's offer to the individual with the Rhode Island area code.

Mid-day on May 7, 2021, Wiley communicated with Al Springfield to acquire even more cut material. GX 26. A rational juror could conclude that more cut material was needed because the pair prepared and packaged kilogram quantities of cocaine the evening of May 6 into the early hours of May 7. Wiley also discussed with Al Springfield the glut of cocaine that was available for distribution, stating, "my peoples is loaded with that shit," and that a source offered Wiley four kilograms of cocaine for $100,000 ("Four for a buck. He was letting them shit go for a quarter."). GX 26.

Wiley then reconvened with Harry at Action Audio where Harry placed a white bag into a Honda Accord and the pair travelled to 327 Park Avenue. While Harry and Wiley were at 327 Park Avenue, Wiley confirmed to Munoz that he had "white girl," and Munoz conveyed that he had

customers interested in buying 300 grams of product.  GX 31.

Almost an hour later, at 4:25 pm on May 7, 2021, Wiley called an unknown female and conveyed that he was "in the lab right now" while metallic/machinery noise could be heard in the background of the call.  GX 33.  During this call, Wiley had a separate discussion in the background and stated "yo, this ain't going no more" and "you want me to leave this shit or take it out," where a voice can be heard in the background that a rational juror, coupled with cellular site evidence, could conclude was Harry. GX 33. Wiley and Harry then returned to Action Audio at approximately 5:58 pm, where Wiley retrieved a bag from the Honda Accord and departed. GX 268. Later that evening, Wiley called Harry to confirm that a transaction had been consummated and that he was counting the money, or "bread." GX 34.

Based upon this evidence pertaining to May 6-7 of 2021, a rational juror could conclude that Harry and Wiley conspired to distribute and possess with intent to distribute kilogram quantities (more than 500 grams) of cocaine, including Wiley's offer to the Rhode Island individual to source kilogram quantities of cocaine, Wiley's offer to Munoz to distribute 300 grams of cocaine, and Wiley's need for more cut material from Al Springfield.  Specifically, the jury could reasonably conclude that Harry and Wiley prepared kilogram quantities of cocaine for distribution together at 327 Park Avenue and on the evening of May 7, 2021, Wiley informed Harry that at least one sale was consummated and that he was counting the proceeds (the "bread") from the sale.

### iii.   Communications from Harry and Wiley Cellular Telephones

On May 1, 2021, Harry sent a video of what appears to be a kilogram quantity of cocaine

(*i.e.*, a wrapped white substance) to Bro God Ja after Bro God Ja inquired what time his "boy" should "pull up." GX 388. Harry further described that he "still have it," but the "product is one of the hardest to move right now." GX 388.

On May 3, 2021, Harry sent voice memos to Wiley where he described losses related to "product," and that Harry would keep close tabs on his product, "That's why nothing that is involve me right now is leaving my sight." GX 326. Wiley replied that product that Harry was weak, it was stepped on three times ("3xs") and that Harry was selling the product for "33.00." GX 325; 355. Wiley then requested that Harry return the "machine," and Harry replied that he was home and that he "have some stuff to make." GX 325; 355. Coupled with the testimony of TFO Errington related to the distribution and processing of cocaine, a rational juror could conclude that Harry and Wiley were discussing kilogram quantities of cocaine, where weak cocaine is referred to as having been "stepped on," at kilogram quantities and prices, $33,000 ("33.00") per kilogram. A rational juror could further conclude that their conversation related to the machine referred to a kilogram press used for processing cocaine, an item discussed by Wiley with Al Springfield and where two kilogram presses were found in Harry's residence.

On May 17, 2021, Wiley left a voice memo for Harry where Wiley described an unsuccessful attempt at a sale where the prospective customer was "mad" because Wiley "showed him the shit, [Harry's] shit that [Wiley] had cooked for [Harry] which [Harry's] shit was like that gold and yellow color and that shit was white. [The buyer] was like, 'yo this shit too white bro. This some cut shit. I don't want this shit'." A rational juror could conclude that this conversation demonstrated Harry's conspiracy with Wiley to distribute cocaine, but where the buyer was concerned that the

product contained too much cut material. Cut material, various powders, were found at Harry's residence on June 9, 2021.

Further, on May 18, 2021, Wiley sent several voice memos to Harry where Wiley's "best customer" was dissatisfied with product because it was "not the same," requiring Harry and Wiley to return the customer's money. GX 367, 369-373. Wiley told Harry, "I'm over here with my man that *you* gave the sample to. His peoples need something but they don't want the shit that *you* give them a sample of because that shit not it." GX 372. Based on these communications, a rational juror could conclude that Harry and Wiley conspired to distribute kilogram quantities of cocaine, including 200 grams of cocaine that Wiley's customer did not want to take due to the poor quality of the product. GX 338; 366. A conversation between Wiley and Harry a few days later, on May 22, 2021, where the pair discussed prices consistent with kilogram quantities of cocaine and issues where their product was "flat" and required improved mixing, which provided further context that the pair was discussing the distribution of cocaine. GX 36.

### iv.    Cocaine seized at Harry's home

On June 9, 2021, DEA investigators found over a kilogram of cocaine at Harry's residence at 327 Park Ave, along with cut material and kilogram presses. As described above, the evidence elicited at trial showed Harry's use and control of 327 Park Avenue, specifically the first-floor bedroom. As described above, Harry and Wiley jointly prepared cocaine for distribution, including on May 6, 2021, and on May 7, 2021.

Of course, physical possession of 500 grams or more of cocaine is not required in order to provide the quantity reasonably foreseeable to Harry based upon his own conduct in the conspiracy,

or the conduct of others. But based upon his conviction on Count Three, the jury credited evidence to find that Harry knowingly possessed the kilogram of cocaine. A rational jury could conclude that, when coupled with Harry's communications with Wiley and communications with other individuals, the cocaine, cocaine cut material, and tools used for the preparation of kilogram quantities of cocaine found at 327 Park Avenue, provided further evidence of Harry's membership in the cocaine prong of the conspiracy.

Accordingly, Harry's claim of insufficient evidence of his conviction for conspiracy to distribute and possess with intent to distribute more than 500 grams of cocaine is baseless.

### 4. The Government's evidence was sufficient as to the possession with intent to distribute fentanyl and cocaine.

Harry argues that there was insufficient evidence to prove his constructive possession of the fentanyl and cocaine found in his bedroom at 327 Park Avenue. Harry does not dispute his conviction for possession of marijuana, which was found in the first-floor bedroom near the fentanyl and cocaine. Instead, Harry baselessly claims that Wiley *could have* planted the fentanyl and cocaine in the bedroom without Harry's knowledge. Def. Mem. at 7. Harry pursued this theory at his trial, attempting to elicit evidence to support the claim through the testimony of his family members, and argued this theory to the jury during summation. The jury squarely rejected any conjecture that the fentanyl and cocaine could have somehow been planted in Harry's bedroom without his knowledge.

To convict Harry of possession with intent to distribute fentanyl and cocaine, the jury need not find any conspiracy, let alone a conspiracy with Wiley. However, a rational juror could use

evidence that Harry conspired with Wiley to distribute fentanyl, cocaine and marijuana, conspiracy between Harry and Wiley, in assessing whether Harry constructively possessed the fentanyl and cocaine found in his bedroom.

The jury was fulsomely charged on the meaning of possession, including constructive possession and joint possession. While the Government's theory was that Harry strictly controlled access to the first-floor bedroom, the jury did not need to find that Harry had exclusive possession of the fentanyl or cocaine, or that he was the owner of those items.

The jury was provided evidence of Harry's near-daily presence at 327 Park Avenue through cell site evidence. GX 171B. To determine whether Harry possessed the substances, the jury need not have found that 327 Park Avenue was Harry's "legal residence" or even where he slept on most nights. But the jury considered the presence of Harry's personal belongings in the bedroom, including important documents and greeting cards addressed to him, government identification, and notes. Harry's sister testified that money found in the bedroom, in close proximity to the fentanyl and cocaine, belonged to Harry. An ammunition magazine consistent with the firearm and magazines possessed by Harry when he was arrested was found in a dresser with a notebook that contained passwords to online accounts used by Harry. Harry text messaged several individuals in April and May where he said that 327 Park Avenue was his residence, kept his vehicle insured at the residence, was listed on the electric bill, and listed 327 Park Avenue as his residence on business filings. Harry also closely controlled and monitored the exterior video surveillance system, along with an interior video surveillance system that would show individuals who entered (or exited) the first-floor bedroom.

While Harry concedes (or does not contest) possessing some items in the first-floor bedroom at 327 Park Avenue (*e.g.*, cash, marijuana), he challenges the rational conclusions made by the jury that in light of all of the evidence presented at trial – that he possessed the fentanyl and cocaine mere feet away in the very same room. Harry's argument that Wiley had unfettered access to the residence without Harry's knowledge is simply belied by the record, including cell site records and communications between the pair. GX 170B. Nor does it strain credibility that Harry, a drug distributor, would secrete a valuable stash of fentanyl in a box under his bed, while keeping cocaine (and cut material) in a separate nearby container (a bright orange Home Depot bucket). Harry's sister, Onika Harry, testified that thousands of dollars in cash associated with their deceased mother was stored by Harry in the bedroom, which a rational jury could also consider in evaluating whether Harry would control and restrict access to the bedroom.

Harry offered the testimony of Nikola London who, without much specificity, claimed that Wiley frequently stayed at the residence. The jury clearly did not assign much weight to her testimony. During cross-examination, London admitted to a text commination where she asked Harry for permission on behalf of Wiley to use a restroom at the residence, evincing that Wiley did not have unfettered access to the residence. London was present at 327 Park Avenue the evening of May 6, 2021 into the morning of May 7, 2021, but claimed she was unaware of the conduct by Harry and Wiley that occurred overnight at the residence, including the loud background noise captured in intercepted wire communications, described above. London also agreed that Harry remotely monitored the residence using video surveillance, even while traveling, and was strictly aware of who entered and exited the residence.

The testimony of Harry's other family members equally fell flat. The witnesses called by Harry, particularly Stephanie Smith, all but confirmed that between April and June of 2021, Harry stayed in at 327 Park Avenue more often than not, and that he possessed items in the first floor bedroom. The arguments now advanced by Harry are the same as those argued to the jury. But the jury rejected the theory that Wiley, or someone else, secreted fentanyl and cocaine – the very substances discussed by Harry and Wiley in intercepted communications – in the bedroom without Harry's knowledge.

Based upon the full record, including evidence of the drug conspiracy, intercepted wire communications, physical and electronic surveillance, and Harry's electronic communications with Wiley and others, a rational jury could find sufficient evidence that Harry possessed the quantities of fentanyl and cocaine found in his bedroom with the intent to distribute them.

## **CONCLUSION**

For the reasons detailed herein, Harry's Rule 29 motion should be denied.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s/
Patrick J. Doherty
Assistant United States Attorney
Federal Bar No. PHV10400
1000 Lafayette Blvd., 10th Fl.
Bridgeport, CT 06604

54

## <u>C E R T I F I C A T I O N</u>

This is to certify that on December 14, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

PATRICK J. DOHERTY
ASSISTANT U.S. ATTORNEY