UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>KENSTON HARRY | Case No. 3:21-cr-98 (JBA)<br><br>July 31, 2023 |

**RULING ON MOTION FOR JUDGMENT OF ACQUITTAL**

Defendant Kenston Harry moves for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) [Doc. # 605] on the grounds that (1) his conviction on Count One, conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl and 500 grams or more of cocaine, was unsupported by the evidence regarding both his participation in the conspiracy and the amounts that were reasonably foreseeable to him; (2) his convictions for Count 2 and 3 for possession with intent to distribute 400 grams or more of fentanyl and 500 grams or more of cocaine, respectively, were unsupported by the evidence. (Def. Mem. in Support of Mot. for Acquit. [Doc. # 605-1].) For the reasons that follow, Defendant's motion is denied.

I.     **Factual Background**

Defendant Kenston Harry was indicted on October 20, 2021 and charged with conspiracy to distribute and to possess with intent to distribute 400 grams or more of a mixture containing a detectable amount of fentanyl, 500 grams or more of a mixture containing a detectable amount of cocaine, and an unspecified amount of marijuana (Count 1), possession with the intent to distribute 400 grams or more of fentanyl (Count 2), possession with intent to distribute 500 grams or more of cocaine (Count 3), and possession with intent to distribute an unspecified quantity of marijuana (Count 5). (Superseding Indictment, [Doc. # 179].)[1] These charges arose from his involvement with Tajh Wiley, one

---

[1] Count 4 did not apply to Defendant Harry.

of several co-defendants, and the drug trafficking conspiracy Wiley had been running out of the Bridgeport area. (Gov't's Opp'n to Def.'s Rule 29 Mot. [Doc. # 611] at 3.) Defendant's trial was severed from that of his codefendants based on a showing of irreconcilable defenses, and started trial on October 6, 2022, concluding October 17, 2022. (*Id.* at 6.) The jury found him guilty on all counts. (*Id.*)

## II.     Legal Standard

Federal Rule of Criminal Procedure 29(a) requires a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction," but "a defendant claiming that he was convicted based on insufficient evidence 'bears a very heavy burden.'" *United States v. Tigano*, 113 F. Supp. 3d 656, 659 (W.D.N.Y. 2015) (quoting *United States v. Blackwood*, 366 Fed. Appx. 207, 209 (2d Cir. 2010)). The Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012).[2] The Court should grant the motion only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The evidence must be viewed in "totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008), because "each fact may gain color from others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). "[I]t is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Cote,* 544 F.3d at 99 (quoting *Guadagna*, 183 F.3d at 129).

## III.    Discussion

---

[2] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

Defendant moves for acquittal on three grounds: (1) his convictions for Count 2 and 3, possession with intent to distribute fentanyl, should be vacated; (2) his conviction for conspiracy to distribute fentanyl should be vacated, or in the alternative, should be modified to reflect a conviction for a lesser included offense of conspiracy to possess with intent to distribute a detectable amount of fentanyl, consistent with Tajh Wiley's conviction; and (3) his conviction for conspiracy to distribute cocaine should be vacated, or in the alternative, should be modified to reflect a conviction for a lesser included offense of conspiracy to possess with intent to distribute a detectable amount of cocaine.

### A.        Possession with Intent to Distribute Fentanyl and Cocaine

Defendant argues that Wiley was the one who "introduced" the cocaine and fentanyl found at 327 Park Avenue in Bloomfield, Connecticut into the house, and that "considerable circumstantial evidence made it impossible for a rational jury to conclude beyond a reasonable doubt that Harry knew about their presence." (Def.'s Mot. at 7.) Defendant maintains that Wiley had "virtually unfettered access to the house," such as when he was there without Harry or spent the night, or during Defendant's vacation a few days before the June 9 raid when the cocaine and fentanyl were found. (*Id.*) The evidence showed, Defendant asserts, that he was not present during the June 9 raid and that he in fact lived in Windsor, CT, not at 327 Park Avenue. On the other hand, no cocaine or fentanyl were found at Defendant's business Action Audio, where no evidence showed that Wiley was ever inside without Defendant. (*Id.*) The cross-examination of Special Agent McHugh, Defendant maintains, created uncertainties such as where the bucket of cocaine was found, or whether it was covered by anything when it was originally located; as for the drug paraphernalia, McHugh testified that it was in a bag or concealed by a bag, which did not establish that Defendant knew of the presence of those items. (*Id.* at 8.)

Additionally, Defendant contends that the circumstantial evidence pointed to Wiley, not Defendant, being the owner of the drugs, because his "involvement with cocaine was well

documented;" he lived a lavish lifestyle despite being unemployed; drove in a "surveillance-conscious" manner; had an "affinity" for Burberry goods, which is the brand on the box in which fentanyl was found; four cell phones were seized from his residence, and the possession of multiple prepaid phones "is a common trait among drug dealers"; and he had "extensive" oral and written drug-related communications. (*Id.* at 8-10.) Defendant, on the other hand, did not have any drugs in his vehicle when it was searched; he asserts that "none" of Wiley's "oral and written statements about fentanyl" were linked to Defendant; there was "no evidence" of Defendant ever taking any countersurveillance measures; despite wearing Burberry clothing, he did not have the same "affinity" for them as Wiley; Defendant had only one cell phone, registered in his name; and less than 1% of Wiley's wiretap communications were with Defendant. (*Id.*) Defendant alleges that it would be "highly unlikely" that he would have stored cocaine and fentanyl at 327 Park Avenue when the police had been called several times to the residence over incidents with his brother, and that none of the other evidence seized from his house or business proved that he was a "largescale drug dealer"; Defendant maintains that his $2,700 per month Bentley car lease and his home, valued at around $135,000, were consistent with his income from Action Audio and his fiancée's income as a registered nurse. (*Id.* at 10-11.)

Finally, Defendant disagrees with the Government's theory that the drugs likely belonged to him because Wiley's cell records last placed him in the Bloomfield house on May 21, several weeks before the drugs were found there on June 9. (*Id.* at 12.) Defendant argues that it was possible that Wiley simply visited without his cell phone to stash the drugs there, or that he had left it in the house prior to May 21 for distribution in the future. In Defendant's eyes, the Government's failure to submit the cocaine and fentanyl containers for fingerprint or DNA testing, and the location of the fentanyl in a difficult-to-see spot under the bed, are further circumstantial evidence that would make any jury verdict finding that he put the drugs in his home as opposed to Wiley "entirely speculative." (*Id.*)

Despite Defendant's contentions, the Government "need not negate every theory of innocence," *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir. 2000), and a jury verdict "may be based entirely on circumstantial evidence." *Tigano*, 113 F. Supp. 3d at 660. Defendant points to nothing that so strongly calls the Government's case into doubt that no reasonable jury could have convicted him, nor does he point to any particular deficiency in the Government's case that fails to establish a necessary element of the counts he was charged with. The Government, as stated in the Court's jury instructions, was not required to use particular investigative techniques or produce direct evidence; the lack of DNA testing or video evidence proving he was the one who placed the cocaine and fentanyl in his home are not grounds for acquittal given the circumstantial evidence submitted by the Government.

Special Agent Ryan McHugh testified that he participated in the search of 327 Park Avenue and that they located over a kilogram of fentanyl there and over a kilogram of cocaine, as well as drug paraphernalia such as cutting material, plastic wrap, a scale, and a number of presses. (Gov't's Opp'n at 33.) According to McHugh, the kilogram of fentanyl was found in a Burberry box under a bed in a room containing a number of Defendant's personal belongings such as mail addressed to him, and a notebook of passwords to his online accounts; the kilogram of cocaine was found in an orange bucket in the same bedroom. (*Id.* 33-35.)

The Government also submitted evidence specific to Defendant's control of the house where the kilogram of fentanyl was found that was specific to him, rather than to Wiley. First, although the Government alleged that both Wiley and Harry made use of the 327 Park Avenue residence to package and distribute drugs, the Government also submitted specific evidence regarding Harry's control of the 327 Park Avenue residence—the electric bill was in his name, his car registration and pistol registration listed the address as his residence, and his business filing with the state listed that address as his residence as well. (*Id.* at 31; Gov't's Trial Exhs. 220B, 224, 225, 226.) Additionally, Defendant had a video surveillance

system monitoring both the interior and exterior of 327 Park, with monitors located in the first-floor bedroom and apps on his phone that would allow him to remotely control the surveillance systems. (Gov't's Opp'n at 31; Gov't's Trial Exhs. 412. 417-420, 422.) Nikola London, a witness called by Defendant, agreed that Harry used the bedroom where the drugs were found, "and that he remotely controlled the video surveillance at the residence and knew when individuals were coming and going from the residence (and inside of the residence)." (Gov't's Opp'n at 36.) Even when Defendant was out of the state, he would monitor these cameras; for example, while in Puerto Rico, he sent Nikola London screenshots of the internal camera system to complain that someone had been "messing" with the cameras. (October 14, 2022, Trial Tr. at 1072-76.) Nikola London also testified that she would "report" to Defendant when Wiley was at the house in Defendant's absence, going as far as to asking Defendant's permission to allow Wiley inside to use the toilet. (October 14, 2022 Trial Tr. at 1068-70.)

The Court instructed the jury that while "mere ownership or control of a residence does not necessarily mean that the defendant had control and possession of any items found there," control over the physical place the substances were found "is evidence of that person's control over the controlled substance." (Jury Instructions [Doc. # 577] at 19-20.) Based on the evidence that Defendant had control over the residence through his security system and testimony they heard about his possessions found in the same room as the drugs at 327 Park Avenue, the jury could reasonably have found that he possessed the kilogram quantities of fentanyl or cocaine found there either solely or jointly with Tajh Wiley. At bottom, Defendant's argument is that he and the government presented two competing theories over whether he or Wiley owned the drugs found at 327 Park Avenue, and that the jury should have credited his theory as the more plausible one. However, on a judgment for acquittal, the Court is required to credit the jury's inferences on "the weight of the evidence and the credibility of the witnesses." *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006).

6

Here, the jury determined based on those two factors that Defendant was in possession of the drugs found at 327 Park Avenue, and nothing Defendant has argued demonstrates that such an inference is an unreasonable one. The motion to acquit on Counts 2 and 3 is thus denied.

### B.    Conspiracy to Distribute Fentanyl and Cocaine

To uphold a conviction of conspiracy when it is challenged in a motion for judgment of acquittal, "[t]he record must [] permit a rational jury to find: (1) the existence of the conspiracy charged, (2) that the defendant had knowledge of the conspiracy, and (3) that the defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). "When a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)).

"The drug quantity attributable to a defendant knowingly participating in a drug distribution conspiracy includes (1) transactions in which he participated directly; (2) transactions in which he did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him; and (3) quantities he agreed to distribute or possess with intent to distribute regardless of whether he ultimately committed the substantive act." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019). In determining the sufficiency of the evidence with regard to the amount of substance involved in the conspiracy, "quantities of controlled substances in a drug distribution conspiracy prosecution may be determined through extrapolation, approximation, or deduction" as long as there is "evidence of known quantities, which are sufficiently representative of the unknown quantities and from which an approximation of the unknown quantities can logically be derived." *Id.*

### 1. Fentanyl

Defendant argues that there was insufficient evidence that he joined co-defendant Tajh Wiley's fentanyl conspiracy and that the circumstantial evidence suggests that there was no fentanyl conspiracy between the two of them because there was no phone call between Defendant and Harry explicitly involving a discussion about distributing fentanyl, Defendant's initial indictment only charged cocaine and marijuana conspiracies, and the agents executing search warrants at the various residences of the co-defendants were not wearing protective equipment "that would be expected when searching for fentanyl." (Def.'s Mot. at 3.)

However, the Government points out that several pieces of evidence were submitted to the jury from which it could infer that Wiley and Harry were taking part in a conspiracy to distribute fentanyl. In one phone call between Wiley and co-defendant Sashery Feliz on April 20, 2021, Wiley was discussing that he had to put his mask on because "dust" from the "fetty" being packaged in his car was getting in his face; this phone call took place shortly after the phone Wiley was using and Defendant's cell phone were both in the vicinity of Defendant's business, Action Audio. (Gov't's Opp'n at 12-14, Gov't's Trial Exh. 3.) Wiley also sent Defendant a voice note on May 16, 2021 that he had a "play for the f," that "other shit", which the Government argued at trial was fentanyl based on drug expert Officer Errington's testimony regarding "f" being a common nickname for fentanyl. (Gov't's Opp'n at 7-8, 24; Gov't's Trial Exh. 360.) Defendant maintains that he never actually responded to Wiley's voice memos referencing fentanyl "in a way that would have allowed the jury to conclude that he agreed to join Wiley's venture into fentanyl," (Def.'s Mot. at 3), but Defendant replied to the voice memo barely an hour later saying "I'm on my way". (Gov't's Opp'n at 24; Gov't's Trial Exh. 360.) Wiley replied by saying that "Bro I need to u to grab something before u come," and Defendant replied "But I was already on my way I just make some stuff to get some money." (Gov.'s Opp'n at 24-25; Gov't's Trial Exhs. 33, 359.) After sending that message,

Defendant's cell tower data showed him traveling from Action Audio to 327 Park, then to Wiley's apartment in Norwalk, at which point he wrote "I'm here" to Wiley. (Gov't's Opp'n at 24-25; Gov't's Trial Exh. 333, 359, 171B.) Taken together, evidence of the two incidents allows a jury to reasonably conclude that Defendant was aware of and participating in Wiley's conspiracy to distribute fentanyl by allowing Wiley to package it at 327 Park Avenue while he was present, and by assisting in planning the "play for the F."

Even if the evidence was sufficient as to the overall conspiracy, Defendant argues that because Wiley was convicted only of a conspiracy to distribute a detectable amount of fentanyl, rather than the 400 gram amount, the government should have been collaterally estopped from asserting the 400 gram quantity against him. (Def.'s Mem. at 4.) However, the Court rejected Defendant's pretrial motion to dismiss the conspiracy to distribute and possess with intent to distribute 400 grams or more based on a theory of collateral estoppel because under *Standefer v. United States*, 447 U.S. 10, 25 (1980), nonmutual collateral estoppel (when the party seeking to bar the relitigation of an issue decided in a prior proceeding is different from the party in that prior proceeding) cannot be asserted in criminal cases; in other words, Defendant cannot argue that the Government is estopped from asserting an issue that came up in a different defendant's trial, nor did the jury's decision in Wiley's trial preclude a different finding by a jury in Defendant's case. (*See* [Doc. # 525].)

Defendant also contends that even if the Government was not formally estopped from charging him with the 400 grams, if the evidence at Wiley's trial, which was "greater against him than against Harry," was insufficient to convict Wiley of the specific amount, no jury could reasonably have found that the lesser evidence introduced at Defendant's trial was sufficient to convict him of a conspiracy involving 400 grams of fentanyl. (*Id.*) However, the Government's theory at trial was that the kilogram of fentanyl in Defendant's home was part of the fentanyl conspiracy. As detailed above, *supra* at 5-6, the Government presented

9

significant evidence that Defendant was the one who controlled the bedroom where the kilogram of fentanyl was found underneath the bed. The Government also established that no controlled substances were found in Wiley's apartment, from which the jury could have drawn the inference that 327 Park Avenue was being used to store the product for distribution, rather than Wiley's apartment. (Gov't's Opp'n at 32.)

Based on evidence that Defendant and other members of the conspiracy were involved in packaging fentanyl for sale together at places owned and controlled by Defendant such as Action Audio, *supra* at 6-7, and that Defendant traveled from Action Audio to 327 Park before going to Wiley's apartment on May 16, 2021, the day Wiley sent the voice memo about the "play for the f" and asked Defendant to pick something up for him, a reasonable jury could have concluded that 327 Park was being used as a hub to traffic fentanyl, and that the kilogram of fentanyl found in Defendant's bedroom was part of that conspiracy, making its quantity attributable to both the conspiracy and to Defendant personally.[3] Thus, Defendant's motion to acquit on the conspiracy to possess with intent to distribute 400 grams or more of fentanyl is denied.

### 2.   Cocaine

The evidence as to Defendant's involvement in a cocaine conspiracy was voluminous. In the February 2021 call that occurred after Wiley was arrested with cocaine in his car and called Defendant from the Westchester County Department of Corrections, Defendant and Wiley had the following exchange:

> Wiley: No bro, bro. You know what I got caught with?
> Harry: What?
> Wiley: What you think I got caught with bro? Weed?

---

[3] There may have been any number of reasons for what Defendant perceives to be the discrepancies in the verdicts between Wiley's trial and this one regarding the amount of fentanyl involved in the conspiracy; however, without knowing the evidence that the jury chose to credit or not credit in Wiley's trial or the inferences that they drew, the verdict reached in Wiley's trial cannot be used to acquit Defendant based on *Standofer,* discussed *supra* at 9.

Harry: Well, you went to see that dude.
Wiley: We ain't really gonna talk on the phone too much but yea.
Harry: Yea, yea, yea.

(Gov't's Opp'n at 10.) The Government maintained during closing argument that this call was evidence that Defendant was aware of the purpose of Wiley's trip, and that the "What you think I got caught with bro? Weed?" comment was meant sarcastically to indicate that Wiley had been caught with cocaine. In the Government's view, the rest of the conversation, in which Wiley gave Defendant specific instructions on people to avoid and where Defendant asked Wiley whether the police had the password to his phone, reinforced that Defendant was involved with Wiley in the cocaine trafficking conspiracy for which Wiley traveled to Yonkers. (*Id.* at 10-11.)

The Government also submitted pole camera footage from April 27, 2021, showing Wiley at Action Audio, with another individual that the Government argued to the jury was Defendant retrieving items from the trunk of a Honda Accord registered to him. (Gov't's Opp'n at 14; Gov't's Trial Exh. 266.) The individual that the Government submitted was Harry placed a bag in the trunk of Wiley's car, got in the car, and the two drove away from Action Audio. (*Id.*) Special Agent Hoffman testified that he saw Wiley, Defendant, and Myron Brown arrive at 327 Park Avenue a short while later and bring items from the trunk of the vehicle into the house. (Gov't's Opp'n at 14-15.) After Wiley, Defendant, and Brown went into the house, Wiley and Feliz had a call in which Feliz told Wiley she could give him a "joint" that was "fire" for 33, which the Government argued to the jury was a reference to cocaine based on Officer Errington's testimony; at this time, Wiley and Defendant's cell phones were both using towers near 327 Park Avenue. (Gov't's Opp'n at 16; Gov't's Trial Exh. 8, 170B.) On April 28, 2021, Special Agent Hoffman testified that the next day, a phone call (Gov't's Trial Exh. 13, 19) occurred between Wiley, Brown, and an individual named Wiz BK where Wiley, Brown, and Wiz BK discussed Brown pulling up to meet Wiz BK in New York; a second call between Wiz BK and Wiley occurred a few minutes later in which Wiz BK complained that it

11

looked like there was less than "nine" or "nine hundred" in the bag he had been given. (Gov't's Opp'n at 15-16; Gov't's Trial Exh. 14, 19.) The overall context of this transaction, the Government argued, allowed the jury to infer that a sale of 900 grams of cocaine to Wiz BK took place as part of the cocaine conspiracy, and that both the amount and the sale were foreseeable to Defendant.

The Government also submitted evidence regarding a series of transactions that it argued were cocaine transactions within the scope of the conspiracy that took place between May 6, 2021 and May 7, 2021. Defendant and Wiley were in communication in the days before regarding Defendant's complaints that he "took all his money" and paid "for some of product" but was not seeing any of the "profit", to which Wiley replied that "that shit u gave me was stepped on 3xs" and "that's why none my people wanted it," which the Government argued was a conversation about Defendant selling drugs of subpar quantity. (Gov't's Opp'n at 23-24; Gov't's Trial Exhs. 326, 327, 325, 355.) Wiley then told Defendant that he needed his "machine," to which Harry replied that "machine will be there shortly" but he had "some stuff to make." (Gov't's Trial Exhs. 325, 355.)

Three days later on May 6, Wiley had a conversation with Al Springfield asking for something used to make the "joint" into "another one," which Springfield called "press" and which the Government argued based on testimony from drug expert Errington was meant to refer to cutting material used to expand one kilogram of cocaine into two. (Gov't's Opp'n at 17, Gov't's Trial Exh. 17.) During the call, both Wiley and Defendant's phones were near 327 Park, and the Government argued that during a second call a short while later where Springfield confirmed that he could get the "shit" that people "th[e]w in the pitot," Harry could be heard in the background. (Gov't's Trial Exh. 18, 170-171, 173.) The Government submitted evidence that Wiley traveled to Springfield that day and met with Al Springfield before returning to the area of 327 Park Avenue. (Gov't's Exh. 170B, 173-6, 7.) Once back at 327 Park Avenue, Wiley had a call with a woman where chopping sounds can be heard, and

Wiley tells a woman that he was chopping and cooking not "food, but something else." (Gov't's Exh. 24.) During this call and until May 7, 2021, both Defendant's and Wiley's cell phones remained in the vicinity of 327 Park Avenue. (Gov't's Tr. Exhs. 170B, 171B, 173.)

On May 7, 2021, after leaving 327 Park Avenue, Wiley made a call offering to sell "a whole joint for 32k," which the Government argued based on Agent Dearington's testimony meant a kilogram of cocaine for $32,000. (Gov't's Trial Exhs. 170B, 25.) Later that day, pole camera footage showed Wiley and Defendant at Action Audio; Wiley called Al Springfield asking for "another two of them shits, (Gov't's Exh. 26) and discussed getting an offer to buy "four for a buck," which the Government argued meant four kilograms of cocaine for $100,000. (Gov't's Opp'n at 19; Gov't's Trial Exh. 26.) Based on the pole camera footage (Gov't's Trial Exh. 268), after the call with Al Springfield, Wiley and Defendant had another conversation at Action Audio before Wiley left; about 10 minutes later, Defendant called Wiley while Wiley's phone was in the vicinity of 327 Park Avenue to tell him that there were "boxes" by the "front driver side" with instructions on what he should do once he got to the front door. (Gov't's Trial Exh. 170B, 27.) Pole camera footage showed Wiley then returning to Action Audio driving Defendant's white Bentley; on arrival, Defendant and Wiley switched over to a Honda Accord holding a white bag, and leaving from Action Audio back to 327 Park Avenue. (Gov't's Trial Exhs. 268, 180B, 171B.) Once arriving at 327 Park Avenue again, Wiley had a conversation with Peter Munoz telling Munoz that he had the "white girl," and Munoz said he had two guys interested in buying 300 grams. (Gov't's Trial Exh. 31.) Officer Errington testified that "white girl" is a street name for cocaine, and the Government argued that based on the jury's finding, the jury credited this testimony over the testimony of Takisha Carter presented by Defendant that "white girl" can refer to a strain of marijuana. (Gov't's Opp'n at 21.)

In the evening of May 7, 2021, after having told someone on an earlier call that he was "in the lab" while his cell phone was located near 327 Park Avenue, Wiley left with Harry to

13

return to Action Audio in a Honda Accord. (Gov't's Exh. 33, 170, 171B, 268.) At Action Audio, Wiley went inside, came back out to take a white bag from the Honda Accord Defendant had driven them there in, and then put the white bag into his Mercedes. (Gov't's Trial Exh. 268.) Wiley then traveled to Bridgeport, and called Defendant around 8:30pm, telling Defendant that someone had "just got out my car as we speak" and Wiley was "about to go count the bread." (Gov't's Exh. 268, 34.)

More generally, Defendant also communicated with Wiley several times about substances the jury could infer were cocaine; for example, on May 17, 2021, Defendant wrote to Wiley about how he was trying to make it to "ten racks" so he could get his "shit" for "31," which was consistent with the pricing structure and distribution of cocaine. (Gov't's Opp'n at 25.) On June 6, 2021, Defendant sent a voice memo to a contact named "Does Rus" about some product called "white girl," for "eleven dollar per"; Task Force Officer Errington testified that "white girl" is common slang for cocaine. (Gov't's Opp'n at 30.) He was also messaging a contact named "Bro Gad Ja" with a video of a kilogram sized brick of white powder on May 1, 2021. (Gov't's Opp'n at 29-30.)

Defendant attacks the Government's theory regarding the cocaine conspiracy by presenting alternative, potentially innocent interpretations of the Government's evidence. Defendant argues that there was "no evidence" that he was involved in the kilogram of cocaine that Wiley was arrested with during his February 2021 arrest in Yonkers, and that the recorded call from the Westchester jail suggests only that Harry knew Wiley was traveling with marijuana. (Def.'s Mot. at 5.) The video in which Harry is showing a white package, Defendant alleges, cannot support the quantity allegations because it was never seized or tested to determine its weight and contents, or that it was ever actually part of a transaction. (*Id.* at 6.) As for a voice message in which Defendant referred to "white girl," Defendant maintains that it neither demonstrates that he entered into any agreement concerning the substance or that "white girl" was actually cocaine, rather than a strain of

14

marijuana, given that the video following the voice message was of marijuana. (*Id.*) Defendant also contends that even if the conspiracy conviction is not vacated in full, there was no evidence that the conspiracy involved 500 grams, and so that portion should be vacated.

However, the evidence detailed above allows a jury to reasonably infer that Defendant was personally involved in the conspiracy to distribute up to 900 grams of cocaine for the April incident, and between 300 grams to more than a kilogram of cocaine for the May incident. The same rationale concerning Defendant's control of the house and thus the foreseeability of the drugs found there applies with equal force to the fentanyl and the cocaine found under Defendant's bed, meaning that the kilogram of cocaine under his bed could be attributed to him. Finally, the evidence regarding Wiley's February 2021 arrest and the subsequent call between Defendant and Wiley was sufficient to permit a reasonable jury to infer that the kilogram of cocaine in Defendant's car that day was part of the conspiracy, and that its content and amount were reasonably foreseeable to Defendant. Because the amount charged in the indictment would be met if the jury credited the Government's evidence as to any of the four instances discussed above, he has failed to show that the portion of the jury's verdict convicting him of conspiracy to possess with intent to distribute 500 grams or more of cocaine should be vacated.

IV.     **Conclusion**

Defendant's motion for a judgment of acquittal is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of July, 2023.